NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

MOUNT DESERT ISLAND
HOSPITAL, Respondent.

No. 82–1313.

United States Court of Appeals,
First Circuit.

Argued Oct. 6, 1982.

Decided Dec. 14, 1982.

Elliott Moore, Deputy Associate General Counsel, Washington, D.C., with whom William A. Lubbers, General Counsel, John E. Higgins, Jr., Deputy General Counsel, Robert E. Allen, Associate General Counsel, and Sharon Apfel, Washington, D.C., were on brief, for petitioner.

Thomas C. Johnston, Bangor, Maine, with whom Clare Hudson Payne, and Eaton, Peabody, Bradford & Veague, Bangor, Maine, were on brief, for respondent.

Before COFFIN, Chief Judge, TIMBERS,* Senior Circuit Judge, and BOWNES, Circuit Judge.

TIMBERS, Circuit Judge:

The National Labor Relations Board, pursuant to § 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e) (1976), applies for enforcement of its order, reported at 259 N.L.R.B. 589 (1981), requiring respondent Mount Desert Island Hospital to offer immediate employment to former employee Malachy Grange and to cease and desist from committing various unfair labor practices in violation of § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1). The Hospital challenges the legal standard applied by the Administrative Law Judge (ALJ) and the Board, as well as the sufficiency of the evidence supporting the § 8(a)(1) findings.

We hold that there was substantial evidence in the record as a whole to support the Board's finding that the Hospital violated § 8(a)(1) by blacklisting Grange; and we are prepared to enforce the Board's order in that respect. The Board's finding that the Hospital's failure to rehire Grange in the summer of 1979 constituted a § 8(a)(1) violation is also supported by substantial evidence. Since we hold, however, that the Board and the ALJ did not apply the proper legal standard to determine whether the Hospital's refusal to rehire Grange in 1980 violated the Act, we remand the case to the Board for further proceedings in accordance with this opinion and we retain jurisdiction pending the Board's further order.

* Of the Second Circuit, by designation.

## I.

The Hospital hired Grange as a licensed practical nurse in September 1977. In May 1978, Grange began to voice complaints about working conditions in the Hospital as well as what he considered to be inept managerial policies. He discussed his concerns with fellow workers, placed signed and unsigned complaints in the Hospital's suggestion box, and approached his supervisor, Director of Nursing Louise Dunne, to discuss his view of the Hospital's shortcomings.

After receiving little response from his superiors, Grange sent a letter to the editor of the *Bar Harbor Times* on July 3, 1978. This letter detailed his complaints, both with regard to working conditions at the Hospital and with regard to the level of patient care provided by the Hospital.[1] Subsequent to the publication of the letter on July 6, the editor of the *Times* visited the hospital and discussed working conditions with thirty additional employees who substantiated many of Grange's claims. Two weeks later, Grange circulated a petition among the employees of the Hospital requesting that the community and the Board of Trustees of the Hospital investigate working conditions at the Hospital. Over one hundred employees signed the petition. The *Times* printed the petition on July 27. The adverse publicity allegedly was a factor in the decision of the Board of Trustees to cancel its capital fund drive. The Hospital did not discipline Grange for his activities.

Grange resigned of his own accord in December 1978 to pursue a more advanced nursing degree as a registered nurse (RN). At his exit interview he reiterated that, while he enjoyed working with fellow employees, he had found many of the Hospital's procedures to be grossly inadequate. He received notification that he passed the RN examination in March 1979.

In a letter sent shortly thereafter to Dunne, his former supervisor, Grange requested an application for summer employment. Grange called the Hospital on March 27 to renew his request. Dunne responded that nursing positions were available, particularly on one shift. Grange said he wanted such a position. Dunne told him to consider that he was hired. Grange submitted an official application. Dunne's assistant informed him again to consider himself employed as of the summer.

---

1. The text of the letter is as follows:
"CONCERNED ABOUT CARE
To the Editor:
I am a nurse working at MDI Hospital and I am writing this letter to express my opinion concerning the conditions prevailing there now. There is a high degree of frustration and resentment amongst the workers. The administration has added beds (which means an increased patient population) but has not provided for additional staffing to meet the work load. Indeed, when only one nurse is out of work sick, the situation can become intolerable. Only very minimal patient care is given and safety standards are stretched to the limit and beyond.
However, due to poor staffing, this was often the case before the extra beds were added. Now it is that much worse. It seems that everyone, except the budget, suffers in this situation. I often go home after work discouraged and exhausted. I worked hard, but didn't get the chance to meet important needs of the patient. I know for a fact that many of my fellow nurses, as well as many workers in other departments, feel the same way.
Generally speaking, I would say most workers feel underpaid and overworked. We see our meager paychecks eaten away month by month with inflation and we go on without any type of cost of living increase. This unfair situation is compounded by the fact that some administration members are exorbitantly and grossly overpaid in comparison to our salaries. And yet we have to struggle on under adverse conditions, at least partly created and allowed to remain in existence by the administration.
But the real loser is the patient, who as a consumer of a health care service, is not getting his/her money's worth. As a concerned and dedicated bedside nurse, I have seen quality patient care go down the drain.
It seems the administration may have lost touch with the real work of the hospital: caring for the sick and doing it well. Several suggestions and complaints have apparently gone unheeded. With more and more tourists coming to the island, and more and more patients to care for, it is time for the administration to wake up and take action to correct this situation.
Please print this letter for the sake of public interest and free speech.
Thank you."

When Dunne returned from vacation, she informed Lotreck, the Hospital Administrator, that she planned to hire Grange. According to hospital procedures, it was necessary for Lotreck to approve all hiring decisions. Lotreck instructed Dunne to tell Grange that no positions were available, stating that he could not hire someone who had caused the Hospital so much trouble. Subsequently, on May 2, Lotreck instructed his assistant to contact the administrator of the Sonagee Estates Nursing Home to describe the Hospital's dissatisfaction with Grange and to recommend that Sonagee not hire him if he should apply. The administrator of Sonagee testified that he received a phone call informing him that Grange was a troublemaker who had caused grief at the Hospital.

In March 1980, after filing charges with the Board, Grange reapplied to the Hospital for a summer job as a RN. The new Director of Nursing, who believed that Lotreck would not countenance Grange as an employee, responded that no summer position was available. The only summer nurse in fact hired had been promised the job previously. In June, Grange changed his application to one for permanent employment. He was informed that only specialty RNs were needed. He was given a reference, however, for an opening in a nearby hospital. That hospital later offered him a position, which he rejected. The Hospital did not hire any permanent RNs that summer. There was testimony that the Hospital could have trained Grange, as it had trained other nurses in the past, to be a specialty RN in several months, his aptitude permitting.

The General Counsel of the NLRB filed a complaint alleging that the Hospital's refusals to rehire Grange violated §§ 8(a)(1) and 8(a)(4) of the Act. After trial the ALJ found that the Hospital had violated § 8(a)(1) by refusing to rehire Grange because he had engaged in concerted, protected activities while striving for better working conditions through meetings and through the letter published in the newspaper. No § 8(a)(4) violation was found. The ALJ did find further, however, that the

Hospital's advice to Sonagee not to hire Grange constituted blacklisting in violation of § 8(a)(1). Consequently, the ALJ ordered the Hospital to cease and desist from the unfair labor practices and to offer Grange immediate employment in any nursing position available for which he was qualified. The Board adopted the ALJ's findings and his recommended remedy, with the exception that it ordered the Hospital, if necessary, to dismiss any employee the Hospital had hired since refusing to rehire Grange if a vacancy did not exist in a position for which Grange was qualified.

To enforce the Board's order which was entered June 21, 1982, the instant application was filed.

## II.

Section 8(a)(1) of the Act proscribes employer actions which restrain or coerce employees in the exercise of rights guaranteed under § 7 of the Act, 29 U.S.C. § 157 (1976). One of the chief rights protected is the right to engage in concerted activities for the purpose of improving working conditions. *See NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 17–18 (1962). Thus, employers have been held to have violated § 8(a)(1) if they have discharged employees because of the employees' prior protected activities. *Trustees of Boston University v. NLRB,* 548 F.2d 391 (1st Cir.1977); *Hugh H. Wilson Corp. v. NLRB,* 414 F.2d 1345 (3rd Cir.1969), *cert. denied,* 397 U.S. 935 (1970). The instant case presents the question whether refusals to rehire employees based on their past concerted, protected activities similarly constitute violations of § 8(a)(1). To resolve that question, we initially must determine whether a job applicant like Grange is an "employee" within the contemplation of § 8(a)(1). We hold that he is.

Although job applicants may not be afforded the full panoply of protections under the Act, they do qualify for many of the core protections. Our starting point is the decision of the Supreme Court in *Phelps*

*Dodge Corp. v. NLRB,* 313 U.S. 177 (1941), which held that § 8(a)(3) (then § 8(3)) protects applicants from prospective employers who discriminate in regard to hire or tenure of employment. The Court held that § 8(a)(3) covers applicants—to the end of protecting both individual applicants as well as the organizing efforts of employees already hired. The Court said, "The effect of such discrimination is not confined to the actual denial of employment; it inevitably operates against the whole idea of the legitimacy of organization. In a word, it undermines the principle which, as we have seen, is recognized as basic to the attainment of industrial peace." *Id.* at 185.

The Board and various courts of appeals have relied on *Phelps Dodge* to provide job applicants other protections under the Act. For instance, in *Time-O-Matic, Inc. v. NLRB,* 264 F.2d 96, 99 (7th Cir.1959), a foreman told prospective employees that nonmembership in a union was a condition of employment. In holding that the coercive effect of such statements constituted a violation of § 8(a)(1), the court explained that a "violation of section 8(a)(1) of the Act was complete when the statements were made to prospective employees who are employees for purposes of the Act." *Id.* at 99. We followed that interpretation of § 8(a)(1) in *Wyman-Gordon Co. v. NLRB,* 654 F.2d 134 (1st Cir.1981). There an employer interfered with an applicant's free exercise of protected rights by interrogating the applicant as to prior union activities. We held, "That the statutory protections extend to prospective employees is clear." *Id.* at 146 n. 18. *See Reliance Insurance Cos. v. NLRB,* 415 F.2d 1, 6 (8th Cir.1969) ("[A]n employer cannot discriminate against an applicant because of his membership in a union or his views on protected activity under the Act. An applicant is thus treated as an employee within the meaning of § 2(3) of the Act defining an employee.") (dicta); *cf. John Hancock Mutual Life Insurance Co. v. NLRB,* 191 F.2d 483, 485 (D.C.Cir.1951) (protections extended to applicants in the context of § 8(a)(4)).

■ The underlying rationale enunciated in *Phelps Dodge* and amplified in *Time-O-Matic* we believe applies to the instant case. In the refusal to rehire context, the effect of an employer's action, if unchecked, might not only interfere with an applicant's future exercise of protected rights as in *Time-O-Matic,* but also might discourage the employer's current employees from exercising their § 7 rights. We therefore hold that § 8(a)(1) does protect an applicant from an employer's refusals to rehire based on past protected activities.

### III.

■ Demonstrating an unlawful refusal to rehire may pose the difficulty, presented in this case, of balancing, on the one hand, Board counsel's proof that an employer refused to offer employment because of an employee's past protected activities with, on the other hand, the employer's proffer of allegedly legitimate business reasons justifying the action. In *NLRB v. Wright Line, A Division of Wright Line, Inc.,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989 (1982), we set forth guidelines for assessing similar competing claims in the analogous context of a § 8(a)(3) violation. We held that the employer's claim of an independent motive shifts the burden of production, but not the burden of proof, to the employer. *Id.* at 902–05.[2] In other words, after the General

2. The Board appears not to have acquiesced in our *Wright Line* formulation, as to which the Supreme Court denied certiorari. Rather, the Board continues to adhere to its own formulation as set forth originally in the Board's decision in *Wright Line,* 251 N.L.R.B. 1083 (1980). The difference lies in the nature of the burden imposed on the employer after the General Counsel's presentation of a prima facie case of unlawful motive. It is the position of our Court that § 10(c) of the Act requires the General Counsel to prove by a preponderance of the evidence that the unlawful motive was the "but for" cause of the discipline; and therefore that shifting the ultimate burden of persuasion to the employer violates the Act. Our reading of § 10(c) has received support from the Third Circuit in *Behring International, Inc. v. NLRB,*

Counsel's presentation of a prima facie case of unlawful motivation, the employer must present some evidence that the discharge would have been effected irrespective of the discriminatory motive. The burden of proof remains upon the General Counsel to prove that the unlawful motive was the "but for" cause of the discharge.[3] The *Wright Line* standard is equally apposite to refusal to rehire cases when competing motivations are alleged.[4] We therefore shall consider whether the Board's finding of fact here suffices to support a § 8(a)(1) violation under a *Wright Line* analysis.

■ The Board charges that Grange was not rehired in the summers of 1979 and 1980 because of his agitation for better working conditions. It emphasizes that Grange's controversial actions while an employee constituted concerted activity protected under the Act. The Hospital responds by denying that Grange's public protest is protected under the Act and alleging that it had additional legitimate motives for not rehiring Grange. In particular, it contends that in the summer of 1980 there were no openings in permanent positions.

With respect to the summer of 1979 application, it suggests that Grange was not rehired because he was an "unhappy" employee whose dissatisfaction manifested itself in frequent complaints directed at the administration. The first critical issue, therefore, is whether Grange's activity, especially his letter to the *Bar Harbor Times,* represented concerted and protected activity within the meaning of the Act.

The Hospital first challenges the Board's conclusion that Grange engaged in concerted activity by writing the letter to the *Times.* The Hospital argues that use of the first person in the letter suggests that Grange was acting for himself, out of his own unhappiness. Indeed, Grange was the only employee who signed the letter and no evidence was presented that he discussed the plan before putting it into effect. The Board's conclusion, however, finds ample support in the record. Prior to writing the letter, Grange had discussed working conditions extensively with other employees. In the letter itself, he includes references to the plight of fellow workers at the Hospital. The letter may be considered a direct over-

675 F.2d 83, 87–91 (3rd Cir.1982), *petition for cert. filed,* 51 U.S.L.W. 3199 (U.S. July 30, 1982) (No. 82–438), and from the Seventh Circuit in *NLRB v. Webb Ford, Inc.,* 689 F.2d 733 at 739–40 (7th Cir.1982).

The Board, however, maintains that shifting the burden of persuasion to the employer as an affirmative defense is consonant with the plain language of § 10(c), as well as with the legislative history of the Act. Its approach has received support from the Fifth Circuit in *Red Ball Motor Freight, Inc. v. NLRB,* 660 F.2d 626, 627–28 (5th Cir.1981), *cert. denied,* —— U.S. —— (1982), the Sixth Circuit in *NLRB v. Lloyd A. Fry Roofing Co.,* 651 F.2d 442, 446 (6th Cir.1981), the Eighth Circuit in *NLRB v. Fixtures Mfg. Corp.,* 669 F.2d 547, 550 (8th Cir.1982), and the Ninth Circuit in *Zurn Industries, Inc. v. NLRB,* 680 F.2d 683, 687 (9th Cir.1982), petition for cert. filed, 51 U.S.L.W. 3554 (U.S. Jan. 6, 1983) (No. 82–1166).

*See also NLRB v. Transportation Management Corp.,* 674 F.2d 130 (1st Cir.1982), *cert. granted,* —— U.S. —— (1982); *Consolidated Edison Co. v. Donovan,* 673 F.2d 61 (2nd Cir.1982) (dictum); *NLRB v. New York Univ. Medical Center,* 702 F.2d 284 (2nd Cir.1983).

**3.** Of course, the employer always may contest directly the General Counsel's prima facie case

of illicit motivation, and the General Counsel still must prove the existence of such motivation by a preponderance of the evidence.

**4.** We are mindful, however, that the circumstances surrounding a refusal to rehire are not likely to be the same as those in the more familiar discriminatory discharge setting. As the Hospital in this case argues, employers may have countless reasons for not hiring a particular applicant, including reservations stemming from the applicant's past employment record at the company. Conversely, employees usually have less at stake in a refusal to rehire case than in the discharge context. They have less reason to expect that they will be rehired after voluntarily quitting than they have that their employment will continue once begun. Nevertheless, these differences can be considered within the framework of *Wright Line.* It will be a rare case in which an employee has the requisite proof to make out a prima facie case, *see Omni Int'l Hotels, Inc. v. NLRB,* 606 F.2d 570, 572–73 (5th Cir.1979), and even then the employer should be able to meet its production burden more easily than in discharge cases. *See NLRB v. Rich's of Plymouth, Inc.,* 578 F.2d 880, 886 (1st Cir.1978).

**640**

ture for further concerted efforts to improve working conditions. The ALJ's inference that events after submission of the letter indicated prior concerted activity bolsters the above conclusion. Shortly after the letter was published, thirty other employees met with the editor of the *Times* and substantiated Grange's complaints about working conditions. Within three weeks, over one hundred employees signed Grange's petition. Grange's action, even if not endorsed in advance by other employees, clearly had the "welfare of other workers in mind." *Randolph Division, Ethan Allen, Inc. v. NLRB*, 513 F.2d 706, 708 (1st Cir.1975); *see Frank Briscoe, Inc. v. NLRB*, 637 F.2d 946, 949 (3rd Cir.1981) (conduct must have "some relation to group action in the interest of the employees.").

■ The Hospital next asserts that, even if concerted, Grange's letter to the newspaper did not constitute "protected" activity. It relies on the Supreme Court's decision in *NLRB v. Local Union No. 1229, International Brotherhood of Electrical Workers (Jefferson Standard Broadcasting Co.)*, 346 U.S. 464 (1953), for the proposition that concerted activity which manifests disloyalty to an employer is unprotected under the Act. In *Jefferson Standard*, employees striking a broadcasting company passed out leaflets attacking the company's programming as amateurish and second-class. The Court held that distributing the leaflets was indefensible since the leaflets attacked company policies unrelated to labor relations, they did not ask for public support, and the employees were obligated to protect the employer's interests while remaining on the company payroll. *Id.* at 475–77. In implementing the disloyalty rule of *Jefferson Standard*, the Board and courts of appeals have focused on two criteria—whether the appeal to the public concerned primarily working conditions and whether it avoided needlessly tarnishing the company's image. For example, the Board in *Coca-Cola Bottling Works*, 186 N.L.R.B. 1050 (1970), found that striking employees who distributed leaflets warning customers of possible vermin and dirt in coke bottles were not

engaged in protected activity. In *American Arbitration Association Inc.*, 223 N.L.R.B. 71 (1977), the Board found that in protesting work conditions an employee forfeited her protected status by ridiculing her employer in a questionnaire mailed to clients. *See also New York Chinatown Senior Citizens Coalition Center, Inc. and April S. Sung*, 239 N.L.R.B. 614 (1978) (Board found that employees who publicly disparaged the way their employer managed the center were not protected under the Act). Similarly, the Hospital here argues that Grange's decision to air his complaints in public demonstrated disloyalty and hence the activity was unprotected. It suggests that Grange should have continued to protest internally through the proper channels and that his public display proves that he was not sincerely interested in improving labor relations.

The Board and courts of appeals, however, have found public appeals protected when they appeared necessary to effectuate the employees' lawful aims. In *Misericordia Hospital Medical Center v. NLRB*, 623 F.2d 808 (2nd Cir.1980), the court held that the employer violated § 8(a)(1) in discharging a nurse for conveying criticism of the hospital administration's staffing policies to an outside accrediting agency. Although some of the complaints were directed at managerial policies outside the scope of working conditions, the court found sufficient nexus with a labor dispute to hold that the activity was protected. *Id.* at 812–14. Similarly, in *Community Hospital of Roanoke Valley, Inc. v. NLRB*, 538 F.2d 607 (4th Cir.1976), the court upheld the Board's finding that the employee in question was not "disloyal." There, in a case strikingly similar to the instant one, Weinman, a nurse, in interviews on television protested the hospital's working conditions. The court held that the nurse's statements were directly connected to the working conditions at the hospital, were not fabricated, and hence were not disloyal. *Id.* at 610. Indeed, in the instant case, Grange had complained to his superiors previously and had placed signed complaints in the sugges-

tion box. Apparently he felt that recourse to the public was necessary. The Hospital attempts to distinguish *Roanoke Valley* by asserting that the nurse's charges were justified in *Roanoke* while Grange's arguably were not. Such a distinction strikes us as not persuasive as long as the assertions were not made in reckless disregard of the truth. Grange's comments, like those of Weinman, were made for the purpose of improving working conditions and thus the level of patient care. The ALJ found that criticism of the Hospital's administration was intertwined inextricably with complaints of working conditions. Even if the staffing situation were worse in *Roanoke,* Grange published his letter in a spirit of loyal opposition—not out of malice or anger.[5] We hold that the Board's conclusion that Grange's public protests were protected under the Act finds substantial support in the record.

■ This does not end our inquiry. The Board next must demonstrate that the Hospital's refusal to rehire Grange stemmed from the concerted, protected activities. The Board had ample support in the record to establish a causal connection between the Hospital's refusal to rehire Grange and Grange's prior protected activities. With respect to the summer of 1979 opening, administrator Lotreck summarily countermanded a subordinate's decision to hire Grange, specifically because Grange had "caused trouble" at the Hospital the summer before. He followed up that action by informing a nearby nursing home that it would not be in its best interest to hire a troublemaker like Grange. With respect to the summer of 1980 position, the new Director of Nursing testified that she believed that Lotreck would not hire Grange under any circumstances, and that for the permanent RN positions several specialty nurses were hired. The Hospital therefore must refute the Board's presentation by showing

that the General Counsel did not produce sufficient evidence to demonstrate that the unlawful motive was a "but for" cause of the refusal to rehire.

The Hospital's efforts to demonstrate a lawful motive and thereby undercut the Board's proof as to unlawful motive fall into three categories: (1) that Grange's activities had manifested disloyalty; (2) that Grange had been an "unhappy" employee, criticizing his superiors and thereby undermining group morale; and (3) that there were no positions available which suited Grange's qualifications. The first category may be disposed of summarily, since we have held above that Grange's activities were not disloyal but were protected under the Act. With respect to the second category, the claim that Grange was "unhappy" at the Hospital was not credited by the ALJ; and substantial evidence in the record as a whole supports that factual finding. Grange may have been critical, but there was testimony that he enjoyed his job and worked well with both his peers and his supervisors. The Hospital's first two categories of rationale for its decision appear to be pretextual and do not cast doubt upon the ALJ's conclusion that the unlawful motive was the "but for" cause of the refusal to rehire. *See Wright Line, supra,* at 907–09. Thus, since these justifications were the only ones relied upon to support the Hospital's refusal to rehire in the summer of 1979, the Board's finding that its refusal constituted a violation of § 8(a)(1) must be enforced.

■ The Hospital's justification for its refusal to rehire Grange for the summer of 1980, however, is on a different footing. For the summer of 1980, the Hospital hired only one part time nurse with credentials similar to those of Grange. That decision was made pursuant to a prior commitment. Although it hired several full time specialty

5. The Hospital argues that such publicity not only damaged the Hospital's image in the eyes of the public and potential donors, but also undermined patients' faith in the treatment they received. It cites *NLRB v. Baptist Hospital, Inc.,* 442 U.S. 773, 783 (1979), which circumscribed organizational activities in hospitals in order not to disrupt patient care. That holding, however, did not extend to concerted activity outside the hospital's premises.

RNs, all had received greater experience and training than had Grange. The Hospital's offer of proof on these claims cannot be dismissed out of hand as clearly pretextual or insubstantial. *See NLRB v. Steinerfilm, Inc.,* 669 F.2d 845, 850 (1st Cir.1982). Therefore, in conformance with our *Wright Line* opinion, the ALJ should have determined whether the General Counsel proved that the unlawful motive, as opposed to the legitimate reasons proffered by the Hospital, was the "but for" cause of the refusal to rehire Grange. Instead, the ALJ concluded, "Whatever may be the actual case with regard to the hospital's desire to hire only nurses with specialized training, I find the true state of affairs with respect to Grange to be that the hospital would not voluntarily rehire him regardless of his qualifications." 259 N.L.R.B. at 594. The ALJ simply did not make the critical determination required by *Wright Line,* namely, whether the General Counsel had proven that the unlawful motive caused the refusal to rehire. It is not clear that the ALJ would have reached the same conclusion had he required the General Counsel to sustain the overall burden of proving "but for" causation. We find it necessary to remand the case to the Board with instructions to determine whether, with respect to its finding that the Hospital violated § 8(a)(1) in refusing to rehire Grange in the summer of 1980, the General Counsel proved causation by a preponderance of the evidence. *See NLRB v. Transportation Management Corp.,* 674 F.2d 130 (1st Cir. 1982) (remand of mixed motive discharge case in light of *Wright Line* ), *cert. granted,* —— U.S. —— (1982).

### IV.

■ We have no hesitation in holding that substantial evidence in the record as a whole supports the Board's finding that the Hospital violated § 8(a)(1) by advising another employer not to hire Grange. The Hospital does not dispute the evidence that assistant administrator O'Neill telephoned Sonagee Estates Nursing Home at Lotreck's instigation. According to the administrator of Sonagee, O'Neill informed him that Grange was not being hired at the Hospital because he was a "troublemaker" and warned him not to hire Grange. The fact that Sonagee nevertheless eventually made Grange an offer does not undermine the finding that the Hospital attempted to blacklist Grange because of his protected activities in violation of § 8(a)(1) of the Act.

■ The Hospital urges two objections to the Board's remedial order. It contends that since it only attempted to "blacklist" Grange once and subsequently referred him to two other employers, a cease and desist order is too extreme. Whatever merit there may be in the Hospital's contention, we believe that upholding the Board's remedial order generally may tend to protect other employees from future violations of the Act. *See NLRB v. Raytheon Co.,* 398 U.S. 25, 27–28 (1970). Since the Act has granted the Board wide discretion in fashioning remedies, we are prepared to enforce the Board's cease and desist order. We need not decide now the propriety of that portion of the Board's order requiring the Hospital to offer immediate reemployment to Grange since the Hospital's objections may become moot, depending on the Board's order to be entered on remand.

Accordingly, while we are prepared to enforce the Board's order in the respects indicated above, we remand the case to the Board for further proceedings pursuant to this opinion. We retain jurisdiction pending the Board's further order, any review of which shall be heard by the panel that heard the instant application.

*Remanded.*