## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## PORTLAND AIRPORT LIMOUSINE CO., INC., d/b/a PALCO, Respondent.

### No. 98–1397.

United States Court of Appeals, First Circuit.

Heard Nov. 6, 1998.

Decided Dec. 21, 1998.

Lawrence C. Winger, with whom Kraft & Winger were on brief for respondent.

Leslie Randolph, Attorney, with whom Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, John D. Burgoyne, Acting Deputy Associate General Counsel, and Charles Donnelly, Supervising Attorney, were on brief for petitioner.

Before SELYA, Circuit Judge, ALDRICH and CAMPBELL, Senior Circuit Judges.

CAMPBELL, Senior Circuit Judge.

Before us is an application filed by the National Labor Relations Board ("the Board") for enforcement of its order issued against Portland Airport Limousine Co., Inc. ("PALCO"). The Board ruled that PALCO violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), when it discharged employee Wayne Speed for engaging in what the Board determined to be protected, concerted activity under section 7 of the Act, 29 U.S.C. § 157. Speed, a truck driver, was fired when he refused to drive his assigned tractor because of safety concerns. This case raises the single issue whether Speed's refusal amounted, in context, to concerted activity or was, instead, an individual act. In holding the former, the Board overturned the contrary decision of its Administrative Law Judge ("ALJ"). For the reasons that follow, we decline to enforce the decision of the Board.

## I.  BACKGROUND

PALCO operates a trucking facility in Scarborough, Maine. Wayne Speed was employed as a truck driver for PALCO from July 1994 through February 22, 1995. Speed was regularly assigned to drive tractor number 40.

On February 21, 1995, Speed noticed an exhaust smell in tractor number 40. Speed inspected the tractor, but could not locate the source of the fumes. He filed an internal driver vehicle inspection report, which stated simply "Exhaust Leak." Stephen Bennett, the operations manager at PALCO, testified before the ALJ that on the afternoon of February 21, 1995, Speed complained to him about headaches that he felt were the result of exhaust fumes from tractor number 40. Later that same day, Bennett arranged for R & R Services, which regularly performs maintenance and repair work on PALCO's equipment, to inspect the truck. R & R did not locate any exhaust leakage in or around the engine compartment or cab area of the truck, and reported that the truck was safe to operate.

On February 22, 1995, Speed reported to work and drove tractor number 40 to Jay, Maine. When Speed reached Jay, he called John Connolly, the morning dispatcher at PALCO, and reported that he had completed the run to Jay, still smelled exhaust, and thought that the truck was unsafe to drive outside Maine.[1] When Speed returned to PALCO later that morning, Connolly instructed him to take tractor number 40 to Triple J, another vehicle maintenance operation patronized by PALCO, for a second inspection.

Speed took the tractor to Triple J. Initially, the Triple J mechanics failed to locate an exhaust leak. Upon closer inspection, however, mechanics discovered a "pinhole" sized leak in the exhaust on the outside of the trailer. Speed reported the mechanic's findings to Connolly, who told him to take the tractor back to Triple J for its annual inspection, which was due to be completed by the end of the month. Josselin Beaulieu, Triple J's owner, testified that the Triple J mechan-

ics did not discover anything during the annual inspection to indicate that tractor number 40 was unsafe. Beaulieu testified that the "pinhole" sized leak was located at the top of the exhaust stack, which would not result in fumes inside the tractor.

On February 22, 1995, Speed was scheduled to take a load to Boston. When Speed returned from the Triple J inspection, Bennett directed him to switch tractors with driver Emile Pelchat, a new employee, and to make his scheduled Boston deliveries with Pelchat's tractor. Bennett directed Speed to notify Pelchat, who was not familiar with the run to Boston, that he was to drive Speed's truck in the local Portland area that day. Speed saw Pelchat driving into the yard and told him: "I'm taking your truck. I'm not driving mine. I smell fumes." Pelchat asked Speed what was going to happen to him, and Speed told him he did not know. Pelchat testified that he told Speed that if tractor number 40 was not safe for Speed, it was not safe for him or any other driver. This was the only conversation between Speed and Pelchat concerning the condition of tractor number 40.

After the conversation with Speed, Pelchat went into the dispatch office and told Bennett that if tractor 40 was not safe for Speed to drive, he was not going to drive it either and would quit if ordered to do so. Bennett asked Pelchat whether he was aware of anything specifically wrong with the truck, and Pelchat said that he was not. Bennett suggested that Pelchat drive Speed's tractor around the block to verify for himself that he could not smell any fumes. Pelchat did so, remained nervous about the truck when he returned, and, due to his nervousness, had difficulty attaching Speed's trailer to the tractor. Bennett told Pelchat to take the rest of the day off.

Bennett then spoke to Mark Bernstein, PALCO's owner, about the situation involving Speed and tractor number 40. Bennett told Bernstein that the truck had been inspected and found safe by both R & R and Triple J, but that Speed continued nonethe-

---

1.  Speed did not indicate why he felt the truck was safe to drive within Maine, but not outside the state.

less to refuse to drive it. Bennett also explained to Bernstein that he had instructed Speed to exchange trucks with Pelchat, but that Pelchat had objected to driving an unsafe tractor. Bernstein told Bennett that he did not believe that Pelchat should have been involved in the issue relating to the safety of Speed's tractor, and that Speed should have been dealt with individually. Bernstein added that drivers should not be allowed to pick and choose their jobs, which he felt Speed was doing, and that if an employee did not want to take an assigned load he should be dismissed.

Speed eventually returned to the dispatch office with Pelchat's tractor. As he was preparing his log for the trip to Boston, dispatcher John Bell interrupted and told Speed to quit work for the day. Immediately thereafter, Bernstein came outside and asked Speed several times whether he was going to take tractor number 40 to Boston. When Speed replied that he would not drive an unsafe truck, Bernstein told Speed that if he did not drive the truck he was fired. When Speed continued to refuse to drive tractor number 40, he was terminated by Bernstein.

In February 1995, the Board issued a complaint alleging that Speed was discharged "because of his protected concerted activities" in violation of sections 7[2] and 8(a)(1)[3] of the Act. After a hearing, an ALJ found that Speed's complaints concerning the safety of tractor number 40 and his conversation with Pelchat did not constitute "concerted activity" within the meaning of section 7 of the. Act and, thus, that his termination did not violate Section 8(a)(1) of the Act. The ALJ dismissed the complaint. The Board reversed. The Board found that Speed had engaged in concerted activity and that PALCO violated the Act when it discharged

Speed because of that activity. The Board's order requires that PALCO cease and desist from the unfair labor practices, reinstate Speed, and make Speed whole for any loss of earnings and benefits.

## II.  DISCUSSION

■ The Board seeks enforcement of its order, which was based upon its findings that Speed (1) had engaged in "concerted activity," and (2) was terminated by PALCO because of his concerted activities. The Board's finding that Speed engaged in "concerted activity" within the meaning of section 7 the Act is conclusive if supported by substantial evidence on the record as a whole. *See* 29 U.S.C. § 160(e). "[T]he task of defining the scope of § 7 'is for the Board to perform in the first instance as it considers the wide variety of cases that come before it,' *Eastex, Inc. v. NLRB*, 437 U.S. 556, 568, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978), and on an issue that implicates its expertise in labor relations, a reasonable construction by the Board is entitled to considerable deference." *NLRB v. City Disposal Systems, Inc.*, 465 U.S. 822, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984) (citations omitted). We conclude, for the reasons that follow, that the Board's finding of "concerted activity" is not supported by substantial evidence.[4]

Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7 of the Act]." 29 U.S.C. § 158(a)(1). One of the rights guaranteed to employees in section 7 is the right to "engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or pro-

---

2.  Section 7 provides:

    Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.

3.  Section 8(a)(1) provides:

    It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7].

4.  Because we hold that the Board's finding of concerted activity is not supported by substantial evidence, we need not reach PALCO's alternative argument that Speed would have been discharged in any event for unprotected conduct. *See NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 400, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983); *see also Wright Line*, 251 NLRB 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).

tection." 29 U.S.C. § 157. *See El Gran Combo de Puerto Rico v. NLRB*, 853 F.2d 996, 1002–004 (1st Cir.1988).

As the Supreme Court has noted, "[t]he term 'concerted activity' is not defined in the Act...." *City Disposal Systems*, 465 U.S. at 830, 104 S.Ct. 1505. The Court explained in *City Disposal Systems* that in enacting section 7, "Congress sought generally to equalize the bargaining power of the employee with that of his employer by allowing employees to band together in confronting an employer regarding the terms and conditions of their employment." *Id.* at 835, 104 S.Ct. 1505. The Court stated that while "concerted activity" plainly "embraces the activities of employees who have joined together in order to achieve common goals," *id.* at 830, 104 S.Ct. 1505, what is not clear from the language of the Act is "the precise manner in which particular actions of an individual employee must be linked to the actions of fellow employees in order to permit it to be said that the individual is engaged in concerted activity." *Id.*

In its *Meyers* decisions, the Board clarified the test it applies to determine whether an employee's actions are linked sufficiently to the actions of fellow employees so as to be deemed "concerted." *See Meyers Indus., Inc. v. Prill*, 268 NLRB 493 (1984) ("*Meyers I*"), *rev'd sub nom. Prill v. NLRB*, 755 F.2d 941 (D.C.Cir.), *cert. denied*, 474 U.S. 948, 106 S.Ct. 313, 88 L.Ed.2d 294 (1985), *on remand, Meyers Indus., Inc. v. Prill*, 281 NLRB 882 (1986) ("*Meyers II*"), *aff'd sub nom. Prill v. NLRB*, 835 F.2d 1481 (D.C.Cir.1987), *cert. denied*, 487 U.S. 1205, 108 S.Ct. 2847, 101 L.Ed.2d 884 (1988). In *Meyers I*, the Board held that safety complaints concerning a company truck made by a single employee acting on his own were not "concerted activity" within the meaning of section 7 of the Act. The Board stated that an employee's action may be deemed "concerted" for purposes of section 7 only if the action is "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself." *Meyers I*, 268 NLRB at 497 (footnote omitted). In *Meyers II*, the Board explained that its objective standard of concerted activity "encompasses those circumstances where individual employees seek to initiate or to induce or to prepare for group action, as well as individual employees bringing truly group complaints to the attention of management." *Meyers II*, 281 NLRB at 887.

In his opinion, the ALJ applied *Meyers II* and found that Speed had not engaged in "concerted activity" within the meaning of section 7 of the Act. The ALJ found that "Speed's statement to Pelchat was an individual action whose sole purpose was to benefit himself." *Portland Airport Limousine Co, Inc. d/b/a PALCO*, 325 NLRB No. 38 (October 13, 1995), 1998 WL 30260, at *11. The ALJ explained:

> After all, if the truck were really unsafe as alleged by Speed, exchanging with Pelchat would have a detrimental effect upon him. By telling Pelchat that he was exchanging trucks with him, Speed was not seeking to initiate, induce or prepare for group action. Rather, he was simply following Bennett's direction and notifying Pelchat that they were to exchange tractors.

*Id.*

In ruling, to the contrary, that Speed was engaged in "concerted activity," and that PALCO discharged Speed because of that activity, the Board reasoned as follows:

> [T]he conversation between Speed and Pelchat led to Pelchat's initial refusal to drive the truck. Thus, this case involves two employees refusing to drive a truck because of a shared concern about the truck's safety. Once Speed and Pelchat had their conversation and Pelchat protested to management about the reassignment of the trucks, Speed no longer was acting in furtherance of an individual complaint. Instead, the Respondent was faced with a concerted refusal by both of these employees to drive Speed's tractor. The Respondent knew about that concerted refusal, and the conclusion is inescapable that the Respondent discharged Speed as a result.

*Id.* at * 2.

The Board's above reasoning stands in marked contrast to the test for "concerted activity" described in its *Meyers* decisions. The Board does not point to any evidence that Speed was "seek[ing] to initiate or to induce or to prepare for group action," *Mey-*

*ers II*, 281 NLRB at 887, when he approached Pelchat and told him that they were going to switch trucks. Pelchat's credited testimony was that Speed told him: "I'm taking your truck. I'm not driving mine. I smell fumes." Pelchat then asked Speed what he was supposed to do, and Speed responded that he did not know. The single, brief conversation between Speed and Pelchat, which occurred immediately after Bennett instructed Speed to switch trucks with Pelchat and as Pelchat drove his truck into the yard, does not support an inference that Speed sought to "join[ ] forces" with Pelchat in a "common endeavor," *Meyers II*, 281 NLRB at 887 n. 10.

Evidence is lacking that Speed had discussed his safety concerns with Pelchat or any other employee prior to February 22, 1995, the day he refused to drive his truck and was terminated. Nor was there any evidence that Speed sought the support or assistance of Pelchat or any other employee in remedying those safety concerns. The brief conversation between Speed and Pelchat does not demonstrate a concerted plan of action and there is no evidence that Speed's refusal to drive tractor number 40 was intended to enlist the support of Pelchat or any other employee. In sum, Speed's complaints "were made by himself and for himself alone, and thus cannot be deemed concerted." *Meyers I*, 268 NLRB at 501.

The facts in this case are, indeed, nearly identical to those held by the Board in *Meyers I* to be insufficient for "concerted activity." In *Meyers I*, the ALJ had found that at least some of the discharged employee's complaints about the safety of his truck were "concerted," since another driver made similar complaints, in the presence of the discharged driver, about the safety of the same vehicle. The Board rejected the ALJ's finding that these complaints constituted "concerted activity." It stated:

> Indeed, the most that can be inferred from this scenario is that another employee was individually concerned, and individually complained, about the truck's condition. Taken by itself, however, individual employee concern, even if openly manifested by several employees on an individual basis, is not sufficient evidence to prove concert of action.

*Id.* at 501. By the same token, the instant record demonstrates that Pelchat's complaint, while similar to and subsequent to Speed's, was an individual complaint. There is no evidence that Speed urged Pelchat to complain to management about tractor number 40. Speed did not accompany Pelchat to the management office when Pelchat made his complaint. Nor is there any other evidence from which the Board could infer that Pelchat's complaint was a manifestation of group will or activity.

■ The facts differ from those reviewed by the Board in *Meyers I* in only one significant respect. In *Meyers I*, there was no evidence that the two employees had ever discussed their safety concerns with one another, while here Speed addressed Pelchat briefly in the yard to tell him that the two men were going to switch trucks because Speed "smelled fumes" in tractor number 40. A conversation, even one involving one speaker and one listener, may be deemed "concerted activity." *See Meyers II*, 281 NLRB at 889 (citing *Mushroom Transp. Co. v. NLRB*, 330 F.2d 683, 685 (3d Cir.1964)). However, to qualify as such, "it must appear at the very least that it was engaged in with the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interest of the employees." *Mushroom Transp. Co.*, 330 F.2d at 685. As said, there is no evidence that Speed was looking toward group action in the interest of fellow employees when he spoke to Pelchat. Indeed, as the ALJ supportably found, the exchange of vehicles would not have benefitted Pelchat at all, but rather would have been to his detriment, as he would have been forced to drive a truck that Speed himself considered unsafe.

The Board's finding that Speed had engaged in concerted activity was based solely upon Pelchat's *response* to Speed's statement that they were going to switch trucks because Speed smelled fumes in tractor number 40. Upon learning of the proposed switch, Pelchat confronted Bennett and refused to drive Speed's truck. The Board reasoned that Pelchat's reaction to the proposed vehicle exchange transformed Speed's individual complaint into concerted activity.

Under the test adopted by the Board in the *Meyers* cases, however, the question is whether Speed sought *when he approached Pelchat* "to initiate or to induce or to prepare for group action." *Meyers II*, 281 NLRB at 887.[5] As said, the clear weight of the evidence is that Speed was motivated solely by his own personal safety concerns, and was not acting as a representative of other employees for their common benefit.

We find it disturbing that the Board made no attempt to analyze the facts within its own *Meyers* framework.[6] Neither, moreover, did it purport to overrule *Meyers* nor articulate some new standard. Rather, the Board proceeded on the theory that Speed engaged in concerted activity because Speed and Pelchat raised a safety concern and "[t]he subject matter of Speed's complaint and his conversation with Pelchat clearly involved terms and conditions of employment," 1998 WL 30260, at *3. This cuts close to resurrecting, without, however, saying so, the Board's pre-*Meyers* rule in *Alleluia Cushion Co.*, 221 NLRB 999 (1975) and progeny that individual complaints concerning matters of safety may constitute "concerted activity." In *Alleluia* and its progeny, the Board determined that such complaints were "concerted" on the theory that safe working conditions are presumed to be a matter of concern to all within the work force. *See id.* at 1000. This concept of "constructive concerted activity" was expressly rejected by the Board in the *Mey-*

*ers* cases in favor of the Board's present test, which, as said, asks whether there is any objective evidence in the record that the discharged employee sought to band together with at least one other employee in pursuit of a common goal. As such evidence is lacking in this case, we conclude that the Board's finding of "concerted activity" is not supported.[7]

This Circuit's decision in *El Gran Combo*, upon which the General Counsel places primary reliance, does not support the Board's present rationale. *El Gran Combo*, unlike this case, is wholly consistent with the *Meyers* formulation. In *El Gran Combo*, we held that the record supported the Board's determination that two band members engaged in "concerted activity" where they solicited assistance from fellow band members in protesting the terms of a record contract entered by the band's manager. 853 F.2d at 1004–05. The record demonstrated that there were repeated attempts by the objecting band members to enlist the support of their fellow band members, including public protests of the terms of the contract made in the presence of the manager and the other members of the band. We characterized one such protest as an effort to "light a fire under the rest of the band members." *Id.* at 1005. Thus, the record indicated that the employees had engaged in solicitation, preparation, and inducement, as opposed to "mere

5. We noted in *El Gran Combo* that "[e]ven where an action may look at first to be solely individual in nature, subsequent events may reveal implicit group endorsement." 853 F.2d at 1002. That language does not assist the General Counsel. The only "subsequent event" in the record is Pelchat's refusal to drive Speed's truck. That event did not constitute an "implicit group endorsement" of Speed's refusal to drive his truck, but rather was a manifestation of Pelchat's own individual safety concern. *Compare NLRB v. Mount Desert Island Hosp.*, 695 F.2d 634, 640 (1st Cir.1982) (upholding Board finding of concerted activity where, after discussing working conditions extensively with other employees, employee wrote letter to newspaper complaining of work conditions and citing complaints of fellow workers, and subsequently over one hundred employees corroborated employee's complaints and joined employee's petition to management).

6. The Board noted without elaboration that the ALJ had relied upon *Meyers II* in finding no concerted activity. It also noted, again without elaboration, that Chairman Gould "questions the

validity of the ultimate holding in Meyers I & II," but believes "that the conduct here would be found concerted even under the standard of those cases." *PALCO*, 1998 WL 30260, at *5 n. 6.

7. The Supreme Court has identified certain actions engaged in by individual employees that may nevertheless be considered "concerted activity." For example, joining and assisting labor organizations are deemed concerted activity for purposes of section 7 of the Act. *See City Disposal Systems*, 465 U.S. at 831, 104 S.Ct. 1505. The Court has also held that a lone employee's invocation of a right grounded in a collective bargaining agreement is concerted activity. *See id.* at 835, 104 S.Ct. 1505. Here, the Board did not base its finding of "concerted activity" on any such theory of special individual activity. Rather, the Board relied upon the theory that Speed and Pelchat acted together to address a "shared concern."

griping," which is not afforded protection under the Act. *See City Disposal Systems*, 465 U.S. at 833 n. 10, 104 S.Ct. 1505. In contrast, Speed's blunt statement to Pelchat that they would be switching trucks because he "smelled fumes" in his own truck and would not drive it was "mere griping," not an inducement or call to group action.

■ We recognize our duty to defer to the Board's expertise in labor relations, and do not lightly overturn its determination. But deference is due only to conclusions that are supported by substantial evidence and to constructions of the Act that are "reasonable." In determining reasonableness, we look both at the statutory language and at Board, as well as judicial, precedent. A leading commentator has pointed out that "[t]he dominant law clearly is that an agency must either follow its own precedents or explain why it departs from them." 2 K. Davis, Administrative Law Treatise § 11.5 at 206 (1994). *See also Massachusetts Dep't of Ed. v. United States Dep't of Ed.*, 837 F.2d 536, 544–45 (1st Cir.1988) (once an agency "builds a body of precedent . . . it cannot thereafter lightly disregard" that precedent, but must follow, distinguish, or overrule it). Here the Board has neither followed nor distinguished its *Meyers* precedents, nor has it specifically overruled them. Such a disregard of precedent leaves employers, employees, ALJs and Board personnel to operate in the dark—as evidenced here by the Board's reversal of an ALJ whose only error seems to have been to have followed the Board's own precedents. *See Davila–Bardales v. INS*, 27 F.3d 1, 5 (1st Cir.1994)("[T]he law demands a certain orderliness. If an administrative agency decides to depart significantly from its own precedent, it must confront the issue squarely and explain why the departure is reasonable."). We have indicated that "more careful scrutiny" of Board orders is warranted where the Board's interpretation of the facts, unlike that of its ALJ, is not supported by application of the Board's own precedents. *NLRB v. Matouk Industries, Inc.*, 582 F.2d 125, 128 (1st Cir.1978). Applying those precedents, we hold that the record does not support the Board's finding that Speed en-

gaged in "concerted activity." His section 7 rights were not, therefore, violated by his discharge.

Our conclusion that Speed's discharge was not prohibited under section 7 of the Labor Management Relations Act does not leave drivers having similar safety concerns without a remedy. Congress addressed the scenario before us in the Surface Transportation Assistance Act, 49 U.S.C. § 31105(a)(1) ("STAA"), which provides that an employee may not be terminated based upon the employee's "reasonable apprehension of serious injury to [himself] or the public because of the vehicle's unsafe condition." [8] *Id.* An employee need not join forces with other employees to invoke the protection of the STAA.

For the reasons stated, we decline to enforce the decision and order issued by the Board.

---

**8.** Speed apparently threatened to file charges against PALCO with the United States Department of Transportation. Like the refusal to drive an unsafe vehicle, the filing of a DOT complaint is also protected employee activity under the STAA. *See* 49 U.S.C. § 31105(a)(1).