A.M. CAPEN'S CO., INC., Plaintiff,

v.

**AMERICAN TRADING AND PRODUCTION CORPORATION, Defendant.**

A.M. CAPEN'S CO., INC., Plaintiff,

v.

**Blas Rossy ASENCIO, et al.**

Nos. Civ. 94–1367 DRD,
Civ. 94–1483 DRD.

United States District Court,
D. Puerto Rico.

March 31, 1998.

Jose E. Colon–Santana, Hato Rey, PR, for co-defendant, defendant.

Philip E. Roberts, San Juan, PR, for plaintiff.

## OPINION AND ORDER

DOMINGUEZ, District Judge.

Plaintiff requested a statutory provisional remedy under Article 3A of the Dealers Contract Law (the "Act"), Law No. 75 of June 24, 1964, as amended, P.R.Laws Ann. tit. 10,

§ 278b–1. Plaintiff alleged an impairment to the dealership contract based on Defendant's violation to the exclusivity provisions of the dealership contractual letter. A separate complaint, latter consolidated, alleged a tortious interference with contractual relations against Blas Rossy Asencio, the additional dealer appointed by Defendant. The court following the standard of *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir.1991), determined ultimate likelihood of success on the merits, potential irreparable injury to Plaintiff outweighed by harm to the Defendant and determined that the public interest would not be adversely affected by the relief. *A.M. Capens Co., Inc. v. American Trading and Production Corporation*, 892 F.Supp. 36, 37–38 (D.P.R.1995). The court further concluded that Plaintiff was a "dealer" under the law, that under conflict of law standards and dominant contacts Puerto Rico law applied and determined that Puerto Rico was a proper forum. The Court of Appeals for the First Circuit affirmed, agreeing with the trial court that the dealership status was "a close matter." *A.M. Capen's Co., Inc. v. American Trading and Production Corporation*, 74 F.3d 317, 319 (1st Cir. 1996). The appellate court also affirmed the applicability of local law and made no expression as to venue since the issue was not properly elevated.

The trial court granted Defendant a further opportunity to provide additional facts on dealership status since our initial determination was preliminary. When Defendant did not raise additional facts, the court closed the "dealership" coverage matter based on the initial record and scheduled a hearing on damages. *A.M. Capen's Co. Inc. v. American Trading and Production Corporation*, 973 F.Supp. 247, 259 (D.P.R.1997).[1] The trial court further provided guidelines as to damages under the Act in the above captioned cases of "impairment" of a contractual relationship as distinguished from a "termi-

---

1. Later, at the hearing on damages, Plaintiff confirmed that all goods sold in Puerto Rico were sold F.O.B. Continental U.S.A. and further that no taxes whatsoever were paid in Puerto Rico. The matter of dealership, hence, is extremely close since Plaintiff therefore contributes slimly to the Puerto Rican economy raising serious doubts as to legislative intent in the coverage of Plaintiff under the Act.

nation case of dealership." *A.M. Capen's*, 973 F.Supp. at 263–69.

Defendant alleged that the formula of the law contained at Article 3 of the law, P.R.Laws Ann. tit. 10, § 278b [2] is applicable only to termination and, hence, inapplicable to the instant case wherein Plaintiff remains as the dealer. Plaintiff, on the other hand, alleged that the formula of the law is mandatory. The court determined that "both parties are partly correct and partly incorrect: There is no legal support for the Defendant's contention that the factors enumerated in Section 278b are never applicable to impairment cases, but there is no legal support for the Plaintiff's insistence that damages must always be awarded pursuant to each and every one of the factors enumerated in Section 278, regardless of whether the distribution relationship was merely terminated or impaired." *A.M. Capen's*, 973 F.Supp. at 263.

The court suggested the following guidelines:

(a) The list of factors contained at Section 3A applies (not mechanically nor automatically) at the discretion of the court to impairment cases. Said listing is not mandatory.

"[T]he factors listed [in Article 3A of the Act] were only guidelines for the fixing of damages and do not bind the court to automatically award indemnity applying each and every factor. The court has discretion to apply the fac-

tors listed in the light of the specific circumstances of each case ..." *Marina Industrial, Inc. v. Brown Boveri Corp.*, 114 Official Translations of the Opinion of the Supreme Court of Puerto Rico 86, 118, 114 P.R. Dec. 64, 90 (1983).

(b) The Civil Code of Puerto Rico provides the principal rules for the calculation of damages. *A.M. Capen's*, 973 F.Supp. at 264.

(c) Plaintiff must prove the existence of damages. *Marina Industrial*, 114 P.R.Dec. at 90.

(d) Claimants are obligated to mitigate damages. *Computec Sys. Corp. v. General Automation, Inc.*, 599 F.Supp. 819, 828 (D.P.R.1984).

(e) There is no conflict between Law 75 and the Civil Code, they complement each other. *A.M. Capen's*, 973 F.Supp. at 266.

(f) The court shall entertain potential loss of goodwill damages notwithstanding the potential problem of duplication stated at *Pan American Computer Corp. v. Data Gen. Corp.*, 562 F.Supp. 693, 700 (D.P.R.1983) and *Ballester Hermanos Inc. v. Campbell Soup Co.*, Civ. No. 92–1096(JP) 1993 WL 269656 (D.P.R.1993).

(g) The court shall authorize as relevant evidence post impairment profits under Article 3 of the Act. *Casas Office Machines, Inc. v. Mita Copystar America, Inc.*, 961 F.Supp. 353, 361 (D.P.R.1997)

2. The factors stated in the law are the following:

(a) the actual value of the amount expended by the dealer in the acquisition and fitting of premises, equipment, installations, furniture and utensils, to the extent that these are not easily and reasonably useful to any other activity in which the dealer is normally engaged;

(b) the cost of the goods, parts, pieces, accessories and utensils that the dealer may have in stock, and from whose sale or exploitation he is unable to benefit;

(c) the good will of the business, or such part thereof attributable to the distribution of the merchandise or to the rendering of the pertinent services, said good will to be determined by taking into consideration the following factors;

(1) number of years the dealer has had charge of the distribution;

(2) actual volume of the distribution of the merchandise or the rendering of the pertinent services and the proportion it represents in the dealer's business;

(3) proportion of the Puerto Rican market said volume represents;

(4) any other factor that may help establish equitably the amount of said good will;

(d) The amount of the profit obtained in the distribution of the merchandise or in the rendering of the services, as the case may be, during the last five years, or if less than five, five times the average of the annual profit obtained during the last years, whatever they may be.

(h) The damages are to be ultimately granted under loss of profit not loss of income.

(i) The parties were encouraged to illustrate the court on pretax damages or, in the alternative, after tax damages.

A bench hearing as to damages was held on October 29 and 30 of 1997, (Dockets Nos. 128, 129). Plaintiff filed a sealed memorandum, (Docket No. 127), when Defendant requested an extension after simultaneous briefs were ordered. Defendant was granted, the extension and filed its memorandum shortly after Plaintiff's Memorandum was filed (Docket No. 130).

Camilo Fernández testified for Plaintiff as President, sole stockholder and as an accountant (expert). Ronald J. Kevane testified as an expert accountant with experience in determining dealership damages under the Act.

## DAMAGES ·

■ Mr. Camilo Fernández, the President, Chief Executive Officer and sole stockholder of Plaintiff, A.M. Capen's, testified as to damages. He was a public accountant in Cuba educated in Havana University with a degree in economics and Ph.D. also from said university. Mr. Fernández also received two years of law education from Havana University. Mr. Fernández worked as an auditor for Montecristo Cigars in Cuba, comptroller for the National Medical School and advisor for the National Merchants of Paper in Cuba. In the United States has been an accountant for the Elizabeth Lions Club. In Havana he was a member of the College of CPA's and a member of the Latin America Chamber of Commerce. In the United States he is a member of the School/Office Products Association and Garden State Office Products and a member of the Board of Directors of the College State Bank in New Jersey. He has never testified in court as an expert. Mr. Fernández has not been certified as an accountant in any state of the Union. In the last thirty years, since he entered the United States from Cuba in 1961, he has not practiced his profession as an accountant and has not provided any opinion to any client as to his profession. As a businessman, Mr. Fernández has been a representative for various american office supplies manufacturers. He has been the owner of a paper clip manufacturing company and the owner of a medical laboratory.

■ Although the matter was close, the court accepted Mr. Fernández as a CPA expert, and authorized him to testify as to the profit and losses of A.M. Capen's and to provide lay mans opinion as to the economic damages of his company. See *Shane v. Shane*, 891 F.2d 976 (1st Cir.1989) (under Fed.R.Ev. 701, opinion testimony by lay witness of an owner of a company was authorized to testify about the value of the company); *Robinson v. Watts Detective Agency*, 685 F.2d 729 (1st Cir.1982), *cert. denied Consolidated Service Corp. v. Robinson*, 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953 (1983). The court exercised its discretion and authorized Mr. Fernández' testimony because of his education in public accounting and Ph.D. in economics. As to the value of the company and/or loss for the impairment, he not only may provide expert lay opinions, but also worked closely with the economic summaries prepared by the original expert scheduled to testify in court.

Mr. Donald J. Kevane testified as a CPA expert for Defendant American Trading and Production Corp., hereinafter referred to as "ATAPCO." Mr. Kevane has been in the private practice of the profession for forty-three years including twenty-four years with Arthur Andersen & Co., where he was an auditor partner for twelve years. He graduated from San Diego State University of California and enjoys CPA certificates in California and Puerto Rico. While at Arthur Andersen he was assigned to Los Angeles, San Francisco, Milan, Rome, Athens and, since 1968 in San Juan, P.R. In 1975 Mr. Kevane established the accounting and tax firm of Kevane Peterson and Pasarell. He provides tax and/or audit litigation support services and has had extensive experience (over twenty-five cases) in calculating damages under Law 75. He has been accepted (three times) as an expert to testify as to Law 75 damages in other cases in federal and state court.

The court revisits briefly the uncontroverted factual background of the case:

> Capens entered into an agreement with ATAPCO's predecessor, Sheller–Globe to be exclusive distributor of Globe–Weiss and Steelmaster office products in Puerto Rico, the Caribbean, the Dominican Republic, and Central and South America. The agreement did not contain an expiration date. Although confirmed in a written letter, the parties did not sign a formal contract because they could not agree on the law that would apply to the contract. When ATAPCO took over, the arrangement with Capen's continued, as did the disagreement as to choice-of-law and forum selection clauses.

> ATAPCO, with its principal place of business in Missouri, wanted Missouri law to apply to the contract. Capen's, a New Jersey corporation with its principal place of business in that state, wanted Puerto Rico law to apply. As a result, ATAPCO and Capen's never signed a formal contract. In December 1993, ATAPCO wrote a letter to Capen's in which it terminated the exclusive aspect of the dealership. ATAPCO did not end the Capen's dealership; it reserved the right to sell to others. ATAPCO made Bias Rossy Asencio a sales representative for the area for which Capen's originally had the exclusive rights.

*A.M. Capen's Co.*, 74 F.3d at 318.

The impairment created by authorizing Bias Rossy to sell began at the end of January 1994 and ended when the trial court issued injunctive relief on June 16, 1995.

■ In order to determine impairment, the court must analyze the trend of profits by reference to the formula at section 278b(d); an inquiry as to the Globe–Weiss–Steelmaster's profits obtained, if any, during the five years prior to the impairment act is to be originally determined. Both experts agree as to basic gross sales figures of ATAPCO Products and gross profit made on freight to transport the product in Puerto Rico during the 1989–1993 period. The experts differ as to net profits figures.[3]

## TABLE I

| | 1989 | 1990 | 1991 | 1992 | 1993 |
|---|---|---|---|---|---|
| Gross sale of Product | 346,824 | 381,181 | 360,944 | 433,487 | 423,564 |
| Profit made on Freight | 11,400 | 12,600 | 11,900 | 14,330 | 14,000 |
| Gross Profit sales/freight | 357,224 | 393,781 | 372,844 | 447,817 | 437,564 |
| Cost of goods | 296,534 | 325,425 | 311,514 | 364,530 | 346,968 |
| Commissions | 19,952 | 22,295 | 20,202 | 22,919 | 22,074 |
| 2% Prompt Payment Disc. | 5,931 | 6,528 | 6,230 | 7,291 | 6,939 |
| 2% Advertising Allowance | 5,931 | 6,528 | 6,230 | 10,936 * | 10,409 * |
| NET COST OF GOODS | 264,720 | 290,673 | 278,852 | 323,384 | 307.546 |
| % OF NET PROFIT/ SALES | 23.67% ** | 23.90% ** | 22.74% ** | 25.40% ** | 27.39% ** |
| Net Profit P.R. | 82,104 ** | 91,108 ** | 82,092 ** | 110,103 ** | 116,018 ** |
| Gross Sales of Capen's World Wide | 8.1 m | 8.2 m | 9.7 m | 11.5 m | 12.2 m |
| % of Sales of Globe–Weiss Steelmaster in P.R./Total sales Capen's World Wide | 4.3% | 4.6% | 3.7% | 3.8% | 3.5% |

\* Increased to 3% according to calculations performed by Mr. D. Kevane
\*\* Net profit and % of net profit/sales are determined according to figures provided by Plaintiff.

Gross profit pursuant to A.M. Capen's financial statement is calculated as the amount billed to customers, less cost of the particular item billed to ATAPCO plus various items: Commissions, a 2% discount due to in prompt payment, and 2% advertising allowance (although no advertising was performed in Puerto Rico).

3. Experts also agree as to cost of goods, commissions, prompt payments, allowance, advertising, gross sales worldwide figures during the preimpairment period.

Growth factor in the five years prior to impairment based on Plaintiff's calculation (Tr. 64–65) was 10.4% per year.

In calculating the yearly net profit for Glob e–Weiss–Steelmaster's sales in Puerto Rico, A.M. Capen's' President authorized operational expenses only in the amount of 1.9% to a maximum of 2.3% to be deducted from gross profit sales/freight as follows:

### TABLE II

| 1989 | 1990 | 1991 | 1992 | 1993 |
|---|---|---|---|---|
| 6,747 (1.9%) * | 7,623 (2%) * | 6,857 (1.9%) * | 9,970 (2.3% ) * | 9,741 (2.3%) * |

* Percentage of sales of Globe–Weiss–Steelmaster in P.R.

Capen's compensation to officers and executives per year was the following:

### TABLE III

| 1989 | 1990 | 1991 | 1992 | 1993 |
|---|---|---|---|---|
| 1,137,552 (14%) ** | 1,481,143 (18%) | 1,349,954 (13.9%) | 1,333,870 (11.6%) | 1,235,591 (10.2%) |

* * (% of gross sales world wide)

Plaintiff's representative Fernández deducts from gross profit of Globe–Weiss–Steelmaster's yearly sales in Puerto Rico only 1.4% of the above executive compensation (Table III). This amount is too low in the judgment of the court. A more reasonable deduction as to the total executive bonus is the percentage of sales of A.M. Capen's Globe–Weiss–Steelmaster in Puerto Rico compared to total sales world wide which fluctuates in percentages from a high of 4.6% to a low of 3.5% (see above Table I). Plaintiff should therefore accept as operational expense the 3% to 4% of the total bonus paid to executives. Plaintiff further insists that, although the executive compensation stated above was carried as an expense in the federal income tax yearly returns of A.M. Capen's, the executive compensation should be added to the yearly profit for purposes of this case. After deducting as an operational expense the 1.4% of the annual office compensation (an unexplained fixed amount of around $5,896.00 according to Mr. Fernández), Plaintiff claims the net profits indicated at Table IV (infra). The yearly bonus compensation excludes what Mr. Fernández considers to be "reasonable compensation" of the executives involved. Sylvia Fernández is paid $25,000.00, Marta Fernández $30,000.00, Carmelo Jr. $35,000.00 and Carmelo Sr. $50,000.00. No percentage of these salaries is deducted as an operational expense to determine net profits as to the impaired lines. (Globe–Weiss–Steelmaster P.R.)

Recapitulating, Plaintiff's calculation of gross profits excludes assigning to the impaired lines as an expense any percentage of executive "reasonable compensation," only 1.4% of executive bonuses (even though the sales of said impaired lines are between 4.6%–3.5% of total world wide sales of Capen's) and only the operational expenses indicated at Table II. The final net profits of Plaintiff claimed by Mr. Fernández are the following:

### TABLE IV

| 1989 | 1990 | 1991 | 1992 | 1993 |
|---|---|---|---|---|
| $81,000.00 | $88,000 | $82,000.00 | $109,000,00 | $115,000.00 |

Defendant's expert strongly disagrees. In Kevane's opinion since, pursuant to financial statements and income tax filings in evi-

dence, the operational expense recognized is 15.6% of gross sales, (Tr. 147, Docket No. 128), this same percentage should be recognized to the impaired lines. The court agrees with the opinion of Mr. Donald Kevane since said conclusion is based on Plaintiff's own financial and tax returns. Further, the court considers the opinion of Mr. Kevane more reliable because his credentials and experience in accounting and Law 75 matters are clearly superior. (Mr. Fernández has been dedicated during the last thirty years mainly to managing business and not to providing professional accounting opinions, while Mr. Kevane is an accountant by profession for over forty years with vast experience in Law 75 damage valuations.)

The table of net profit which the court constructs based on 15.6% operational expense deduction is as follows:

### TABLE V

|  | 1989 | 1990 | 1991 | 1992 | 1993 |
|---|---|---|---|---|---|
| Gross Profit/sales | 357,224 | 393,781 | 372,844 | 447,817 | 437,564 |
| 15.6% expenses | 55,726 | 61,429 | 58,163 | 69,859 | 68,259 |
| Net cost of goods | 264,728 | 290,673 | 278,852 | 323,384 | 307,547 |
| Total expenses | 320,452 | 352,102 | 337,015 | 393,243 | 375,805 |
| Net Profit | 36,772 | 41,679 | 35,829 | 54,574 | 61,759 |
| % of Gross Profit to sales | 10.2% | 10.5% | 9.6% | 12.1% | 14.1% |

The net profits under the formula that considers a 15.6% of gross sales as operational expenses produces considerably lower profits than the method proposed by Mr. Fernández where barely a maximum of 2.3% of total sales as operational expenses and a fixed $5,896.00 per year of the executive bonuses is deducted as an operational expense. Under Mr. Fernández' formula, from 1989 to 1993, the net total profit was $481,425 for the period. On the other hand, using Mr. Kevane's method of deducting 15.6% of gross sales as operational expenses, the total amount of net profit for the same period is $230,613 or merely 47% of the profit urged by Mr. Fernández. The court finds valid A.M. Capen's own figures as contained in the financial statements and tax returns, resulting in recognizing a deduction to net profits of ·15.6% of gross sales as operational expenses.

Mr. Fernández proposes that there is a substantial loss of good will to Plaintiff based on IRS ruling 59–60, wherein good will is "based on earnings capacity." (Tr. 83, Docket No. 128.) Mr. Fernández proposes multiplying the earnings of 1993 of $116,000 by ten and deducting 30% of the result for a total of around $800,000.00 in loss of good will or as an alternate method multiplying by two the gross profits of 1993 for around $332,000.00 loss in good will. The court considers said proposal exaggerated and totally unfounded in fact and law.

First, the impairment lasted only eighteen months (end of January 1994 until June 1995). Second, Plaintiff remains at this date representing the impaired lines. Plaintiff's proposal sounds as the loss of good will for termination rather than a loss of goodwill for a period of eighteen months.

There are various factors that the court considers in rejecting Plaintiff's proposal:

(a) "Good will" is a concept attributed to the whole corporate entity of A.M. Capen's. The sales of Globe–Weiss–Steelmaster in Puerto Rico are barely 3.5% of total sales of Plaintiff. (Said percentage was a declining percentage from a high of 4.6% in 1990 to a low of 3.5% in 1993.)

(b) Plaintiff lost no major customers (the ten major customers of Plaintiff in Puerto Rico remained as customers).

(c) The earnings of A.M. Capen's (as verified by the tax return of 1996) were higher than any year prior to date of the impairment. The total earning ability of Capen's has thus not suffered

because of any act of impairment.[4]

(d) By the end of 1996, Plaintiff was selling in P.R. 80% of the sales volume of ATAPCO products in Puerto Rico sold prior to the date of impairment.

(e) Plaintiff provided no proof that their sales would be impaired locally or worldwide beyond the five-year period after impairment.

Defendant urges the court that there is no loss of good will or that the same is minimal. The court agrees and explains.

The court finds reasonable the analysis of Donald Kevane projecting Plaintiff's actual losses to $135,352.00. In order to determine net profit loss, Mr. Kevane uses a growth trend of 5.6% for sales based on known variations during the five-year pre-impairment period. (Expert Kevane finds more reliable and less controverted trends in sales rather than in profits—too many variables in trends in profits "I've never really seen a projection which said that net profit would increase at an average rate during a fixed period of time." Tr. 152–154, Docket No. 128). After determining the increase in sales Kevane "resorting to historical relationship of operating costs and expenses to sales or (in several instances) to cost of sales ... a forecasted income statement [is constructed]." Since actual sales are known for 43 months subsequent to the date of the impairment, sales for the additional seventeen (17) additional month period were estimated." (Ex. "B," Report of Mr. D. Kevane, addendum schedules A, B, & C to the main Ex. "B.")[5] Said analysis yielded that Plaintiff suffered and/or is forecast to suffer damages for the five-year period after impairment valued at $135,-352.00.[6] (Said analysis is illustrated at Ex. "B", addendum, schedules A, B, C.) The court finds said analysis reasonable and adopts the same.

■ As to good will the court finds that the economic analysis for damages of the expert D. Kevane makes Plaintiff whole for any potential losses for a five-year period after impairment based on known actual sales/projected sales for said period; hence, because Plaintiff has no proof of damages after the five year impairment period, adding good will losses would constitute duplicity of damages not authorized under the statute. The court is further persuaded by the following cogent argument:

The argument is that, insofar as recovery under clause [278b(d)] already provides compensation for forgone future profits, it already includes compensation for the portion of those future profits that constitute good will. Therefore the argument concludes, a distributor would be receiving a double compensation for loss of good will if it were to receive an award under both 278b(c) [good will] and 278b(d) [loss of profit].

*A.M. Capen's Co., Inc.,* 973 F.Supp. at 267 citing Salvador Antonetti–Zequeira, La Medida de los Daños bajo la Ley 75, 58 Rev.Jur. UPR, 227 Note # 6 at 245–246. (1989).

Both Plaintiff and Defendants make "stray" arguments that the court must dispose. Plaintiff insists on alleging damages based on the sales made during the period of impairment by Blas Rossy, the party who interfered tortiously with the contractual relationship. Plaintiff alleges that since Blas Rossy sold $528,694.80 in Globe–Weiss–Steelworker's products, 27% (percentage of gross profit to sales) should be granted as a measure of damages. Under this analysis, the damages add to $142,747.00[7] which is an amount close to that granted by the court in this opinion. However, the court refrains from engaging in the analysis urged by Plaintiff because, "even in infringement cases, it would definitely be speculative to presume, without sufficient and valid proof to substantiate said assumption, that all the sales made by other dealers would have been made by the plaintiffs." *Casa's Office Machines v. Mita Copystar America, Inc.,* 961

---

4. See testimony of Mr. Donald Kevane, Tr. 8–11, Docket No. 129.

5. Citation at Addendum to Ex. "B", Introduction.

6. The amount stated is pretax as urged by both parties.

7. Damages calculated using Plaintiff's own version of net profit.

F.Supp. at 361. In the instant case not only has there been a total lack of evidence of proof that A.M. Capen's would have sold the products sold by Rossy but evidence was presented to the contrary in that a considerable part of the sales of Rossy was of products traditionally not handled by Plaintiff.

■ On the other hand, Defendant insists that A.M. Capen's sales in Puerto Rico is between 11% and 12% of its ATAPCO sales and, hence, the dominant contact theory mandates dismissal of the action under Law 75. However, said alleged *de minimis* sales in Puerto Rico amounted to a total of 1.9 million dollars in the pre-impairment five year period (1989–1993) (Ex. "B," D. Kevane Report) and 2.5 million in projected sales for the five-year period post impairment (1994–1998) (Ex. "B," D. Kevane Report addendum, schedule "A"). The court knows of no dollar volume jurisdictional amount which must be met in order for Law 75 to apply. The court refuses to establish said requirement in absence of any indicia whatsoever of legislative intent.

■ Codefendant Blas Rossy requests dismissal of the cause of action of tortious interference with contractual relationship against him based on the fact that Plaintiff failed to prove that Rossy knew of the pre-existing contractual relationship between A.M. Capen's and ATAPCO. On first impression the argument sounds persuasive since in the last hearings there was no evidence presented as to the liability of Blas Rossy and, hence, there seemed a lack of compliance with the criteria set forth in *General Office Products v. A.M. Capen's Sons,* 115 P.R. Dec. 553, 558 (1984).[8] The criteria that must be met are the following:

(a) There must be a contractual relationship between a principal and a dealer.

(b) That the Defendant had prior knowledge of said contract.

(c) That Plaintiff suffered damages.

(d) That a causal relationship exists between Defendants' actions interfering

with the contract and the damages suffered by Plaintiff.

Defendant alleges that there was no proof as to "prior knowledge" by Blas Rossy as to the contractual relationship. Defendant's memory is short. At the injunctive relief hearing held before the Hon. Magistrate Judge Castellanos on June 6, 1994 Plaintiff presented written evidence unquestionably proving prior knowledge of Rossy of the contractual relationship. See the letter of counsel P. Roberts dated Feb. 25, 1994 advising B. Rossy as to the exclusive contractual relationship. (Ex. 2 of Plaintiff, injunctive hearing.) Further, on April 29, 1994, ATAPCO confirmed in writing to Blas Rossy the changes in the ATAPCO relationship with A.M. Capen's (from exclusive to non-exclusive) which were verbally informed prior thereto to Blas Rossy in December 15, 1993 (Joint Ex. IV, injunctive hearing). The allegation as to lack of knowledge is immeritorious.

■ Defendants also urge that costs and lawyers' fees should be taxed against Plaintiff pursuant to Fed.R.Civ.P. 68 (Offer of Judgment). Defendants made an offer of judgment prior to trial of $100,000.00 and an offer of $175,000.00 during the trial. The offer of $100,000.00 is not effective because the judgment amount is superior to said offer, see generally *Yvonne Gil–De–Rebollo v. Miami Heat Ass'n, Inc.,* 137 F.3d 56 (1st Cir.1998). As to the offer of judgment made during trial, that offer would only be effective as to costs and lawyers' fees generated after trial. However, Defendant will not be able to comply with "service . . . ten days prior to commencement of hearings," required under the rule. The request for costs and lawyers fees under FRCP is, therefore, DENIED.

## CONCLUSION

For the reasons set forth in this opinion, Defendants ATAPCO and Blas Rossy are to pay jointly and severally to Plaintiff, A.M. Capen's Co., Inc. $135,352.00 resulting from

---

8. As to tortious interference with contractual relationship, see also the cases of *Dolphin International of Puerto Rico v. Ryder Truck Lines,* 127 P.R. Dec. 869 (1991); *George Dennis Y Metro Investors v. City Federal Savings and Loan Association,* 121 P.R. Dec. 197 (1988); *Borg Warner International Corp. v. Quasar Company,* 95 J.T.S. 30.

an impairment of an exclusive dealership representation (ATAPCO) and a tortious interference with a contractual relationship (Blas Rossy).

■ Costs to be awarded to Plaintiff. No lawyers' fees are to be awarded to Plaintiff. The court explains. This case is governed by diversity jurisdiction standards, meaning that the court must use state substantive law. *Erie R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Daigle v. Maine Med. Ctr. Inc.* 14 F.3d 684, 689 (1st Cir.1994); *Coyne v. Taber Partners I,* 53 F.3d 454, 457 (1st Cir.1995). The applicable state substantive standard is local rule of Civil Procedure 44.4(d) P.R. Laws Ann. tit 32, App. II, which grants lawyers' fees in cases of obstinacy. However, the trial court and the circuit court determined that this case was a "close case" as to dealership status and coverage under Law 75, *A.M. Capen's Co., Inc.,* 74 F.3d at 319. Because this case is a "close case" there can be no temerity or obstinacy as a matter of law. *La Playa Santa Marina, Inc. v. Chris–Craft Corporation,* 597 F.2d 1, 7 (1st Cir.1979) (no finding of obstinacy can be made under Puerto Rican law in cases that present "close questions of fact or law"); *see also Soto v. Lugo,* 76 P.R. Dec. 416, 419 (1954).

Judgment to be issued accordingly.

IT IS SO ORDERED.