MVM INC., Plaintiff,

v.

Marcial RODRIGUEZ, Defendant.

Civil No. 07–2197 (FAB).

United States District Court,
D. Puerto Rico.

July 28, 2008.

Carl E. Schuster, Jose J. Sanchez–Velez, Schuster & Aguilo LLP, San Juan, PR, for Plaintiff.

Lorenzo J. Palomares–Starbuck, Lorenzo Palomares PSC, San Juan, PR, for Defendant.

## OPINION AND ORDER

BESOSA, District Judge.

Various motions are currently pending before the Court. Initially, the Court directed the parties to brief it on the issue of whether a corporation may bring a claim for defamation under Puerto Rico law. On March 28, 2008, plaintiff-counter defendant MVM, Inc. ("MVM") complied with the Court's order (Docket No. 24). Defendant-counter plaintiff Marcial Rodriguez ("Rodriguez") opposed MVM's brief on April 5, 2008 (Docket No. 27). MVM replied to Rodriguez's opposition on April 21, 2008 (Docket No. 31).

On April 30, 2008, MVM filed a motion for judgment on the pleadings (Docket No. 32). Rodriguez opposed it on May 3, 2008 (Docket No. 34), and MVM replied on May 19, 2008 (Docket No. 46).

On May 2, 2008, Rodriguez filed a motion entitled in part "judicial notice of adjudicative facts" (Docket No. 33). MVM opposed this motion on May 13, 2008 (Docket No. 41), and filed a "supplemental motion" on this issue (Docket No. 61).

On May 5, 2008 MVM filed a motion to stay the proceedings (Docket No. 35). The following day, Rodriguez opposed this motion (Docket No. 37).

On June 2, 2008 MVM filed a motion for summary judgment (Docket No. 47). Rodriguez opposed MVM's motion for summary judgment on June 5, 2008 (Docket No. 51). MVM replied to Rodriguez's opposition on June 20, 2008 (Docket No. 60). MVM also filed a motion to strike Rodriguez's statement of "disputed facts" filed pursuant to Local Civil Rule 56 (Docket No. 55) on June 16, 2008. Rodriguez opposed MVM's motion to strike two days later (Docket No. 56).

On June 30, 2008, in response to a request made by this Court at the pre-trial conference held on June 27, 2008, MVM filed a motion to which it attached evaluations of MVM by the United States Marshals Service in the various districts of the First Judicial Circuit (Docket No. 62).

For the reasons stated below, the Court **TAKES NOTE** of MVM's motion in compliance; **GRANTS** MVM's motion for judgment on the pleading; **GRANTS IN PART** and **DENIES IN PART** Rodriguez's motion to take note of the administrative law judge's decision in his NLRB proceeding; **GRANTS** MVM's motion to strike Rodriguez's Rule 56 statement of facts; **DENIES** MVM's motion for summary judgment; and **DENIES** as **MOOT** MVM's motion to stay the proceedings. In short, the Court dismisses this case in its entirety.

## I. Local Civil Rule 56

As an initial matter, it is necessary to discuss Local Civil Rule 56. The rule requires a motion for summary judgment to

be supported by a statement of material facts. L.Civ.R. 56(b). A party opposing summary judgment is then required to submit a statement of facts admitting, qualifying or denying the movant's facts "by reference to each numbered paragraph of the moving party's statement of material facts, and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule." L.Civ.R. 56(c). The opposing statement may also contain a separate section of additional facts, set forth in separate numbered paragraphs and supported by record citations. *Id.* Nowhere in the rule does it state that a party may make legal arguments or conclusory statements of mixed law and fact regarding outstanding disputes between the parties. Rodriguez, nonetheless, has done precisely that.

In response to MVM's statement of uncontested material facts submitted in support of its motion for summary judgment, Rodriguez submits a statement of what he calls "disputed facts," separated into fourteen numbered paragraphs. As MVM notes in its motion to strike, these fourteen paragraphs do not correspond to the first fourteen (or any other set of fourteen) paragraphs submitted by MVM in its Rule 56 statement of facts. In fact, these fourteen paragraphs do not reference MVM's facts at all, and they certainly do not "admit, deny, or qualify" the facts MVM submits as undisputed, as required by the local rule. Moreover, Rodriguez's Rule 56 statement does not once cite to the record. Rather, Rodriguez inappropriately cites to legal authority, makes legal arguments, and takes it upon himself to highlight in conclusory form the factual and legal differences of opinion between the parties. In sum, Rodriguez's Rule 56 submission abjectly fails to comply with the rule.

■ A party's failure to comply with Local Civil Rule 56 may result in the Court denying that party's proposed facts and accepting the opposing party's proposed facts as admitted where those facts are properly supported. L.Civ.R. 56(e); *see Arroyo–Audifred v. Verizon Wireless, Inc.,* 527 F.3d 215, 219–20 (1st Cir.2008); *Alsina–Ortiz v. Laboy,* 400 F.3d 77, 80 (1st Cir.2005); *Garcia Sanchez v. Roman Abreu,* 270 F.Supp.2d 255, 258–59 (D.P.R. 2003). Because every single paragraph of Rodriguez's submission fails in many respects to comply with the local rule, the Court **GRANTS** MVM's motion to strike Rodriguez's statement of contested facts. MVM's facts are deemed admitted where supported by proper record citation.

## II. Judicial Notice

Rodriguez moves the Court to take judicial notice of the decision of the administrative law judge ("ALJ") in his NLRB case pursuant to Fed.R.Evid. 201(a), which governs judicial notice of adjudicative facts. A judicially noticed fact is one "not subject to reasonable dispute" because it is either "generally known within the territorial jurisdiction of the trial court" or it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R.Evid. 201(b). "Because the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b)." *Int'l Star Class Yacht Racing Assoc. v. Tommy Hilfiger U.S.A., Inc.,* 146 F.3d 66, 70 (2d Cir.1998) (citations omitted).

Rodriguez's request pursuant to Fed. R.Evid. 201 is ambiguous, at best. Rodriguez initially requests that the Court "take judicial notice of the facts [sic] that the NLRB has rendered and [sic] adverse opinion against MVM, Inc. and found that MVM, Inc. violated the labor laws."

(Docket No. 33, p. 2) It is not problematic to do so. Rodriguez goes on, however, to request judicial notice of sections of the ALJ's opinion, including findings of fact, conclusions of law and the remedies ordered by the ALJ. *Id.* In typical fashion, as with Rodriguez's other submissions in this case, he fails to cite a single case in favor of his motion. This may, in part, explain why he has requested the impossible.

■■■ Absent unusual circumstances, a court may not take judicial notice of the findings of fact contained in another court's order,[1] *Nadherny v. Roseland Prop. Co.*, 390 F.3d 44, 51–52 (1st Cir.2004) (*citing Int'l Star Class Yacht Racing Ass'n*, 146 F.3d at 70–71; *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir.1994), primarily because "[f]acts adjudicated in a prior case do not meet either test of indisputability contained in Rule 201(b): they are not usually common knowledge, nor are they derived from an unimpeachable source." *Int'l Star Class Yacht Racing Ass'n*, 146 F.3d at 70. Secondly, allowing courts to rely on the factual findings from previous cases would render the doctrine of *res judicata* virtually superfluous. 21B Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure: Evidence* § 5106.4 at 235 (2005); *see also Int'l Star Class Yacht Racing Ass'n*, 146

F.3d at 71 (citing Wright & Graham); *United States v. Jones*, 29 F.3d at 1553 (same). Nonetheless, neither of these rationales prohibit the judicial notice of the fact that another proceeding took place, or of certain other undisputable aspects of those proceedings. Thus, courts may take judicial notice of another court's order for the limited purpose of recognizing the judicial act or the subject matter of the litigation. *Jones*, 29 F.3d at 1553 (citations omitted); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir.2001) (*citing Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.*, 181 F.3d 410, 426–27 (3rd Cir.1999)).

■■■ Applying the existing case law to this case, the Court takes judicial notice of the fact that an ALJ ruled in favor of Rodriguez and against MVM in a proceeding before it pursuant to the National Labor Relations Act ("NLRA"), and that the ALJ found that MVM violated certain sections of the NLRA. The Court does not, however, take judicial notice of the ALJ's findings of fact, such as whether MVM acted with malice. It remains Rodriguez's responsibility to present evidence to the court in favor of his claims. *See Guzman–Ruiz v. Hernandez–Colon*, 406 F.3d 31, 36 (1st Cir.2005) ("plaintiffs cannot sidestep their neglect to offer evidence in this case by asking the court to rule on the basis of

1. The Second and Eleventh Circuits appear to have laid down an absolute rule that a court may not take judicial notice of any adjudicative fact in a court record for the truth of the matter asserted. *See Int'l Star Class Yacht Racing Ass'n*, 146 F.3d at 70–71; *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir.1994). The Seventh Circuit stakes out a slightly different position; it notes that "courts generally cannot take notice of findings of facts from other proceedings for the truth asserted therein" but adds that "it is conceivable that a finding of fact may satisfy the indisputability requirement of Fed.R.Evid. 201(b)." *G.E. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 n. 6 (7th

Cir.1997). The Fifth Circuit has not decided whether a court may take notice of the factual findings of another court on rare occasions subject to Rule 201's indisputability requirement. *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir.1998). While the First Circuit has not engaged in a detailed discussion of this issue, it appears to have adopted the Second Circuit's position. *See Nadherny v. Roseland Prop. Co.*, 390 F.3d 44, 51–52 (1st Cir.2004) (*citing Int'l Star Class Yacht Racing Ass'n*, 146 F.3d at 70–71). Regardless, this discussion is academic to this case because Rodriguez fails to explain which adjudicable facts meet the requirements of Fed.R.Evid. 201.

the record in another case."). Accordingly, Rodriguez's motion for judicial notice of the decision of the ALJ in his NLRB case is **GRANTED IN PART** and **DENIED IN PART.**

### III. Factual Background

MVM provides services to the United States Marshals Service ("USMS") pursuant to a contract covering all of the federal courthouses within the First Circuit, including the District of Puerto Rico. Pursuant to the contract, MVM provides Court Security Officers ("CSOs") to guard the Court and provide security to the judiciary in Puerto Rico and elsewhere in the First Circuit. MVM terminated Rodriguez, a former CSO and union official for the CSOs in the District of Puerto Rico, from employment on March 1, 2007.

MVM states that Rodriguez's termination was the last step in a series of escalating measures taken against him for what MVM characterized as a violation of its internal policies. Rodriguez responds that his termination was a discriminatory and retaliatory act taken against him by MVM because he informed the USMS of the existence of ongoing labor disputes between MVM and the CSOs. In any event, between December 2006 and January 2007, Rodriguez drafted a letter to the USMS (the "USMS letter") in which he accused MVM of, among other things, violating the contract it had with the USMS and violating the collective bargaining agreement ("CBA") between MVM and the CSOs. After writing the letter, Rodriguez "caused it to be published" to the USMS and to Freddie Barreto, a CSO and former union president. (Docket Nos. 1, p. 3, ¶ 11; 5, p. 2, ¶ 10.) Rodriguez also discussed the letter with another CSO, Eduardo Soto. Jim Dolan ("Dolan"),

MVM's project manager for the first circuit contract, authored a memorandum to the CSOs directing them to use the chain of command regarding "MVM personnel matters." [2] (Docket No. 48–3, Exh. 5.)

MVM learned of the existence of the letter. on or about February 5, 2007. On February 6, 2007 MVM suspended Rodriguez pending an internal investigation concerning whether the letter constituted a violation of Mr. Dolan's memorandum directing CSO's to direct personnel related complaints to their supervisors. MVM interviewed Rodriguez twice, on February 14, and February 27, 2007, regarding his letter to the USMS. Rodriguez walked out of the second meeting without explaining why he had written the letter. During the two days between the February 27, 2007 interview and Rodriguez's termination on March 1, Rodriguez did not attempt to contact MVM concerning the letter nor did MVM attempt to contact Rodriguez concerning the letter. MVM terminated Rodriguez for authoring the USMS letter and for failing to participate in the internal investigation, which MVM deemed to be a continuing violation of MVM and USMS policies.

On June 22, 2007 Rodriguez filed a claim of discrimination before the Puerto Rico Department of Labor and Human Resources' Anti-discrimination Unit as well as with the Equal Employment Opportunity Commission ("EEOC"). In these complaints, Rodriguez alleged sex and age-based discrimination and retaliation. That same day Rodriguez filed an unfair labor practice claim with the National Labor Relations Board ("NLRB") in which he alleged discrimination for union activity and retaliation.

---

**2.** At summary judgment, it is not clear whether the USMS letter was drafted and published prior to the circulation of Dolan's memorandum. This factual issue is not material to the Court's resolution of the case, however.

MVM asserts that by authoring and publishing the USMS letter, Rodriguez made defamatory, untrue and inaccurate statements concerning MVM and that Rodriguez attempted to interfere with the contract between the First Circuit and MVM. MVM asserts that its performance evaluations have declined subsequent to the USMS letter. The records concerning USMS's performance evaluations before the Court, however, indicate that MVM has received generally positive evaluations throughout the First Circuit; in the case of the District of Puerto Rico, MVM consistently received a rating of excellent on all factors under evaluation.[3] (Docket Nos. 48–3, pp. 20–32; 62) Additionally, the contract between MVM and the USMS was renewed in 2007, subsequent to the publication of Rodriguez's letter and prior to the filing of this suit. The renewal is a contingent renewal because it is under protest from other bidders. MVM fears that Rodriguez's letter to the USMS *may* be seen as a negative factor in evaluating MVM's past performance, which is a factor under the bidding process for a government contract.

## IV. Summary Judgment Standard

The Court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. The Rule states, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52. (1st Cir.2000). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once a properly supported motion has been presented, the opposing party has the burden of demonstrating that a trialworthy issue exists that would warrant the court's denial of the motion for summary judgment. For issues where the opposing party bears the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. *See Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49, 53 (1st Cir.2000).

In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine." Material means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is genuine when a reasonable jury could return a verdict for the nonmoving party based on the evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is well settled that "[t]he mere existence of a scintilla of evidence" is

---

**3.** None of the performance evaluations submitted to the Court makes any mention of Rodriguez's letter. The closest that any of the evaluations come in terms of the letter's subject matter is an August 28, 2007 evaluation done by Marshal Bonner of the performance of MVM's company manager for the entire First Circuit contract, not only the District of Puerto Rico. The evaluator was asked to evaluate "[A]bility to handle personnel problems such as disciplinary process, labor relations, dealing with unions." (Docket No. 48–3, p. 31) MVM's company manager ranked as a 3 on a scale of 0 to 5, and the comments section contained the following statement: "Good on occasions, seems to take actions of CSOs personally as well. Disciplinary problems have been fine. We have agreed on all of those issues. I know the union does not like him, but they co-exist." *Id.*

insufficient to defeat a properly supported motion for summary judgment. *Id.* at 252, 106 S.Ct. 2505. It is therefore necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion." *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994).

In making this assessment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). The court may safely ignore, however, "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Muñoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990).

## V. Judgment on the Pleadings Standard[4]

■ "The standard for evaluating a Rule 12(c) motion for judgment on the pleadings is essentially the same as that for deciding a Rule 12(b)(6) motion [to dismiss for failure to state a claim upon which relief can be granted.]" *Pasdon v. City of Peabody,* 417 F.3d 225, 226 (1st Cir.2005). A Rule 12(c) motion, like a Rule 12(b)(6) motion, "does not allow for any resolution of contested facts; rather, a court may enter judgment on the pleadings only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment." *Aponte–Torres v. Univ. of Puerto Rico,* 445 F.3d 50, 54 (1st Cir.2006) (*citing Rivera–Gomez v. de Castro,* 843 F.2d 631, 635 (1st Cir.1988)). A court must view the

facts contained in the pleadings in the light most flattering to the non-movants and draw all reasonable inferences therefrom in their favor. *Id.* (citing *Rivera–Gomez,* 843 F.2d at 635); *Pasdon,* 417 F.3d at 226.

■ Additionally, to survive a Rule 12(c) motion a complaint "must contain factual allegations that 'raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true[.]'" *Perez–Acevedo v. Rivero–Cubano,* 520 F.3d 26, 29 (1st Cir. 2008) (*quoting Bell Atl. Corp. v. Twombly,* —— U.S. ——, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)). In other words, plaintiffs must "nudge[ ] their claims across the line from conceivable to plausible[.]"[5] *Twombly,* 127 S.Ct. at 1974.

## VI. Discussion

### A. Defamation

#### 1. May MVM bring a claim?

■ As a threshold matter, the Court must determine whether or not a corporation, as an artificial person, may state a claim for defamation pursuant to Puerto Rican law. Puerto Rico's Libel and Slander Act of 1902 defines libel as:

the malicious defamation of a person made public by writing, printing, sign, picture, representation, effigy, or other mechanical mode of publication tending to subject him to public hatred or contempt, or to deprive him of the benefit of public confidence and social intercourse, or to injure him in his business, or in any other way to throw discredit, contempt or dishonor upon him, or mali-

---

**4.** Rodriguez's three remaining counter claims have been judged 4 under this standard.

**5.** In *Twombly* the Supreme Court "disavowed the oft-quoted language of *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that a 'complaint should not be dis-

missed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in relief of his claim which would entitle him to relief.'" *Rodriguez–Ortiz v. Margo Caribe, Inc.,* 490 F.3d 92, 95–96 (1st Cir.2007) (*citing Twombly,* 127 S.Ct. at 1969).

cious defamation made public as aforesaid, designed to blacken or vilify the memory of one who is dead and tending to scandalize or provoke his surviving relatives or friends.

P.R. Laws Ann. tit. 32 § 3142.

In arguing that a corporation does not have a cause of action for defamation under the laws of Puerto Rico, Rodriguez repeats nearly verbatim an argument that was put to rest nearly forty years ago by this same Court. *See Cooperativa De Seguros Multiples De Puerto Rico v. San Juan,* 294 F.Supp. 627, 629–30 (1968). In that case, one of the defendants argued that the Puerto Rico Libel and Slander Act only applies to natural persons. *Id.* That defendant also confused the libel claim against it with a claim for trade libel, which requires an allegation of special damages. *Id.* Rodriguez repeats the same argument here even to the point that he only cites the exact same cases cited by this Court in *Cooperativa De Seguros Multiples* describing trade libel. (Docket No. 27, p. 2, ¶ 4) This Court finds Rodriguez's argument as unconvincing now as the argument was nearly forty years ago. Notably, Rodriguez failed to cite to any recent case law or changes to the Libel and Slander Act since *Cooperativa De Seguros Multiples* was decided that might dictate a different outcome in this case.

While this Court is surprised by the dearth of reported cases from Puerto Rico in which corporations allege claims for defamation, that does not weaken the principle that a corporation may maintain a suit for defamation. *Id.* (*citing Las Monjas Racing Corp. v. Puerto Rico Ilustrado, Inc.,* 58 D.P.R. 931 (1941)). As stated in *Cooperativa De Seguros Multiples,* "the law of libel of Puerto Rico, moreover, is derived from the United States and can be best interpreted by reference to American Case Law when no local precedents are available. Under the American jurispru-

dence, it is universally recognized that artificial persons can bring such an action." *Id.* at 630. This is no less true now than it was then. *See* 9 Fletcher Cyclopedia Corporations § 4255.50 (rev.2008). Accordingly, the Court reaffirms the holding of *Cooperativa De Seguros Multiples:* a corporation may bring a claim for defamation pursuant to Puerto Rico's Libel and Slander Act of 1902.

### 2. Analysis of MVM's defamation claim

█ To establish a cause of action for libel or slander in Puerto Rico, a plaintiff must allege and prove the following elements: (1) that the defamatory information is false; (2) in cases involving public officers or public figures, that the statement was published with malice, in other words, with full knowledge of the statement's falsehood or underestimating whether it was false or not; (3) in cases concerning private figures, that the information was published negligently; and (4) that the publication caused the plaintiff to suffer real damages. *Cabrero–Muñiz v. Zayas–Seijo,* 2006 WL 1313775 (P.R. May 5, 2006); *Perez Rosado v. El Vocero de Puerto Rico, Inc.,* 149 D.P.R. 427, 441 (1999); *Gonzalez Martinez v. Lopez,* 118 D.P.R. 190, 192–93 (1987); *Torres Silva v. El Mundo, Inc.,* 106 D.P.R. 415 (1977).

█ Where a defamation claim is raised in the context of a labor dispute, however, federal law requires the plaintiff to show that the defamatory statement was made with actual malice, which is defined as knowledge that it was false or with reckless disregard of whether it was false or not. *Old Dominion Branch No. 496, Nat'l Ass'n Letter Car. v. Austin,* 418 U.S. 264, 281, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); *Linn v. United Plant Guard Workers of America,* 383 U.S. 53, 64–65, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). The National Labor Relations Act ("NLRA")

defines a labor dispute as "any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in proximate relation of employer and employee." 29 U.S.C. § 152(9). Although the record is woefully underdeveloped concerning the background to the labor dispute(s) that gave rise to the USMS letter, it does contain the letter itself.

 The letter establishes the existence of a labor dispute between MVM and the CSOs. The letter states that MVM violated the collective bargaining agreement between MVM and the CSOs. (Docket No. 48–2) It goes on to state that the CSOs filed complaints with the NLRB and that employees who complain are threatened with progressive discipline and termination. *Id.* MVM admits to terminating Rodriguez, at least in part because of his role in publishing the USMS letter, which, MVM alleges, contains defamatory falsehoods. Thus, because some of the very same statements which MVM labels defamatory also include allegations that MVM violated a collective bargaining agreement and prevented CSOs from acting together to obtain benefits, the Court finds that the alleged defamatory statements were made in the context of a labor dispute. Accordingly, to state a defamation claim successfully, MVM must allege and prove that the statements were made maliciously.

 MVM did allege that Rodriguez acted maliciously in drafting and publishing the USMS letter; MVM has not supported this allegation, however. As stated above, to show actual malice, MVM must provide evidence that Rodriguez knew the allegedly defamatory statements that he made were false, or that he made those statements with reckless disregard of whether or not they were false. In its Local Rule 56 Statement, MVM claims that at the time that Rodriguez drafted the letter, no government body had determined that MVM violated any law and that Rodriguez did not know that MVM was in violation of the First Circuit contract, as stated in the letter. (Docket No. 48, p. 4, ¶ 12) The first claim is irrelevant to whether or not Rodriguez acted with malice; it is not necessary that a government body determine that MVM violated any law for MVM to have actually violated a law; this is simply a question of whether or not MVM had been caught. The second allegation, that Rodriguez did not know if MVM was in violation of the First Circuit contract, might possibly give rise to an inference of malice but it was not supported by any record citation. MVM cited to two different exhibits containing sections of Rodriguez's deposition testimony. The first, at Exhibit C, reveals that Rodriguez drafted the USMS letter and that he intended to send it. (Docket No. 48–4, Exh. C, pp. 139–40) The second, at Exhibit D, simply was not part of the record. The last page of Rodriguez's transcript included in Exhibit D is page 66, whereas the pages cited by MVM are pages 85 through 88. (Docket No. 48–5, Exh. D) Thus, MVM has not supported its claim that Rodriguez acted with malice in drafting the USMS letter. This alone is a sufficient ground to support dismissal of MVM's claim. *See Garcia Cruz v. El Mundo, Inc.,* 108 D.P.R. 174, 182–83 (1978).

 Putting aside the issue that *Linn* and *Old Dominion* require that MVM allege and support actual malice rather than negligence, MVM's claim is critically deficient as to the element of real damages. MVM claims that it was harmed because its contract with the USMS was renewed on a contingent basis, rather than on a non-contingent basis, and that its performance evaluations declined because of the

USMS letter. MVM then argues that the performance evaluations are an important factor for the government when deciding whether to award a contract. There are two fundamental problems with MVM's claim.

First, the damages alleged by MVM are speculative, not the real damages which MVM must prove. *See, e.g., Goenaga v. West Indies Trading Corp.*, 88 D.P.R. 865, 911 (1963) (prohibiting speculative damages); *White Star Bus Line, Inc. v. Glens Falls Indemnity Co.*, 60 D.P.R. 852, 861 (1942) (same). For example, MVM has not alleged that its contract with USMS was not renewed, nor that it was paid less as a result of Rodriguez's USMS letter, nor that it lost a business opportunity because of an injury to its reputation. MVM merely argues that its renewed contract, which has been challenged by other bidders, may at some future point in time be rescinded. As a corporation, MVM is not eligible for damages related to emotional or mental suffering. Should the contingent contract be cancelled, or if MVM were denied some other business opportunity, then MVM might then state a claim for real damages, if it could also solve the second fundamental problem with its showing.

MVM's other problem, assuming *arguendo* that a decline in performance evaluations is in itself, or could lead to, a cognizable harm, is demonstrating that the decline in performance evaluation was proximately caused by the USMS letter being received by the USMS. The sole evaluation submitted to the Court for a time period subsequent to the publication of the USMS letter (the "past performance survey") made no mention of that letter. The only comments in that evaluation that might possibly be interpreted as indirectly touching upon the same topic of the letter, were comments about the MVM First Circuit manager's handling of employment and labor disputes. The evaluator actually stated that he agreed with the MVM manager's decisions in this regard. Thus, the document fails to support a causal relationship between the USMS letter and the alleged drop in performance evaluations; if anything, the document is circumstantial evidence to the contrary.

The other evaluations submitted consist of USMS evaluations of MVM from each district court within the First Circuit for the period October 2004 through September 2005.[6] Outside of the District of New Hampshire, where MVM ranked between fair and good, MVM usually rated excellent or outstanding in the four areas evaluated. There is no direct correlation between these evaluations and the past performance survey, in which the ratings were between good and excellent. The past performance survey appears to en-

---

**6.** The evaluations use a uniform rating system from 0 to 5 in which 0 is unsatisfactory, 1 is poor, 2 is fair, 3 is good, 4 is excellent and 5 is outstanding. The four areas in which MVM was evaluated were quality of product or service, cost control, timeliness of performance, and business relations. In the District of Maine, MVM received 5, 4, 4, and 5 respectively. In the District of Massachusetts, MVM received 5, n/a, 5, and 5, respectively. In the District of Rhode Island, MVM received 5, 5, 4 and 3, respectively. In the District of New Hampshire MVM received 3, 2, 2, and 2, respectively. In the District of Puerto Rico, MVM received 4, n/a, 4, and 4, respectively. The past performance survey, on the other hand, ranked the MVM company manager for the entire First Circuit contract in the following eight areas: (1) ability to administer and manage the contract; (2) administrative controls such as providing invoices and other reports; (3) ability to handle personnel or labor relation problems; (4) demonstrated financial capability; (5) ability to control costs; (6) recruitment and selection of personnel; (7) compliance with subcontracting programs; and (8) customer satisfaction. The evaluator ranked MVM's company manager as follows: 3, 4, 3, 4, 4, 4, blank, 3.

compass the time period for the entire contract, August 2002 to September 2007. It also rates the company manager for the entire First Circuit rather than MVM's operations generally within each individual district. Lastly, the eight categories in which MVM's First Circuit company manager was judged were different from the four categories used to evaluate MVM in each district. Thus, the allegation that MVM's evaluation results dropped is not supported by the record, and neither is the inference that the alleged drop was caused by the USMS letter.

In sum, MVM has not proven real damages. MVM has not even alleged real damages, only the possibility of one day suffering damages if the USMS rescinds the contingent contract. Not only that but, in responding to the Court's order to provide it with performance evaluations supporting its claim that the evaluations declined subsequent to the USMS letter, MVM provided only pre-letter evaluations for each district. These evaluations provide no support for MVM's allegation that their performance evaluations declined. Accordingly, MVM's motion for summary judgment on its defamation claim is **DENIED** and the Court **DISMISSES** MVM's defamation claim for failure to allege and thereafter support the element of real damages, as well as for failure to support its claim that Rodriguez acted with malice.

### B. Interference with a contract

In count III of the complaint, MVM argues that the USMS letter inter-fered with the contractual relationship between MVM and the USMS concerning the First Circuit. To establish a cause of action for interference with a contractual relationship pursuant to Puerto Rico tort law, MVM must show four elements: (a) the existence of a contract; (b) that the defendant had prior knowledge of the contract; (c) that the plaintiff suffered damages; and (d) that a causal relationship exists between defendants' actions interfering with the contract and the damages suffered by plaintiff. *Jusino Figueroa v. Walgreens of San Patricio, Inc.*, 155 D.P.R. 560, 575–576 (2001); *Dolphin Int'l of P.R. v. Ryder Truck Lines*, 127 D.P.R. 869, 879 (1991); *A.M. Capen's Co. Inc. v. Blas Rossy*, 12 F.Supp.2d 222, 231 (D.P.R. 1998).

Although Rodriguez does not raise the defense himself, the Courts finds that MVM's claim for interference with a contract is preempted by the NLRA.

In *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), the Court established that a state claim is preempted, where the conduct that the state seeks to regulate is actually or arguably protected or prohibited by the NLRA.[7] This Act contains broad provisions that govern both protected "concerted activities" and "unfair labor practices." *Garmon*, 359 U.S. at 241, 79 S.Ct. 773. When it is clear or may fairly be assumed that the activity which a State regulates is protected by section 7 or prohibited by section 8[8] of the NLRA, States

**7.** The issue brought before the Supreme Court in *Garmon* was whether a California state court had jurisdiction to award tort damages for activities that constituted unfair labor practices under state law or whether these types of sanctions fell within the exclusive jurisdiction of the NLRB. *Garmon*, 359 U.S. at 239, 79 S.Ct. 773.

**8.** Section 7 provides:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that

as well as the federal courts must defer to the exclusive competence of the NLRB to avoid interference with federal labor law. *Garmon*, 359 U.S. at 245, 79 S.Ct. 773; *Farmer v. Carpenters*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977); *Int'l Union of Operating Engineers v. Jones*, 460 U.S. 669, 103 S.Ct. 1453, 75 L.Ed.2d 368 (1983). The district courts are not the primary tribunals to adjudicate such issues. *Garmon*, 359 U.S. at 245, 79 S.Ct. 773. There are, however, exceptions to the preemption rule. The Supreme Court has permitted exceptions to the *Garmon* doctrine when the conduct at issue is only a "peripheral concern" of the NLRA or touches on "interests so deeply rooted in the local feeling" in an area that States have traditionally regulated. *Garmon*, 359 U.S. at 243–44, 79 S.Ct. 773; *Jones*, 460 U.S. at 676, 103 S.Ct. 1453. As noted by Justice Powell in *Farmer*, "... inflexible application of the doctrine is to be avoided when the State has substantial interest in regulation of the conduct at issue and the State's interest is one that does not threaten undue interference with the federal regulatory scheme." 430 U.S. at 302, 97 S.Ct. 1056.

The *Garmon* doctrine was later refined by the Supreme Court when it specified that:

> The critical inquiry ... is not whether the State is enforcing a law related specifically to labor relations or one of general application, but whether the state

such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorize in section 158(a)(3) of this title. 29 U.S.C. § 157.

Section 8 provides that it shall be unfair for an employer:

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: *Provided,* That subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organiza-

tion is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; (4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter; (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

law based claim presents a controversy that is identical to (as in *Garner*)[9] or different from (as in *Farmer*) the claim that could have been, but was not, presented to the labor board. For it is only in the former situation that a ... court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the *Garmon* doctrine was designed to avoid.

*Sears v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 197, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978).

In other words, pursuant to *Sears*, if there is an "identical controversy" that could have been or was previously placed before the NLRB and is presented later before the state or federal court, the claim is preempted as long as it significantly interferes with the function of the NLRB and it is not a matter deeply rooted in the local concern.

The Supreme Court has found that under certain circumstances state tort claims do not interfere with the function of the NLRB. In *Farmer v. United Brotherhood of Carpenters*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), the Supreme Court allowed a union leader, intimidated and threatened by other union members, to sue in state court for intentional infliction of emotional distress. Balancing the concerns of the state tort law and the federal scheme, the Supreme Court found that the infringement on federal labor policy was slight and the State had a substantial interest in protecting its citizens from abuse.

Later, however, in *Local 926, Int'l Union of Operating Engineers v. Jones*, the Supreme Court held that a state law action for tortious interference with a contract involved conduct arguably protected or prohibited by the NLRA. 460 U.S. 669, 678, 103 S.Ct. 1453, 75 L.Ed.2d 368 (1983). There, a supervisory employee sued the union alleging that the union's business agent retaliated against him by coercing his employer to breach its employment contract. *Id.* at 672, 103 S.Ct. 1453. The Supreme Court held that, if proven, such conduct violated sections 7 and 8 of the NLRA, and thus the state law claim for tortious interference with a contract was preempted. *Id.*; *See also, Iron Workers v. Perko*, 373 U.S. 701, 83 S.Ct. 1429, 10 L.Ed.2d 646 (1963) (holding that a state tort claim for tortious interference was preempted under *Garmon* doctrine).

■ In this case, the gist of MVM's claim for tortious interference is that Rodriguez's USMS letter caused MVM a loss of good will with the USMS. Rodriguez's letter states that MVM was violating labor laws, the collective bargaining agreement with the union and the federal contract. It goes on to state that the CSOs filed complaints with the NLRB and yet MVM continued to violate the rights that federal labor law gives them to "form, [j]oin or assist a[u]nion[.]" (Docket No. 48–3) These rights are established in section 7 of the NLRA 29 U.S.C. § 157. Employees have the right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection[.]" *Id.* This is exactly what Rodriguez

---

**9.** In *Garner v. Teamsters*, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953) the United States Supreme Court affirmed the judgment of the Supreme Court of Pennsylvania holding that a Pennsylvania state court did not have jurisdiction to issue an injunction against picketing by a labor union in violation of a state labor law when the conduct fell under the jurisdiction of the National Labor Management Relations Act. Therein the United States Supreme Court rejected petitioners' argument that the state law protected private rights, while the federal law was designed to protect only public rights. *Id.* at 500–01, 74 S.Ct. 161.

did: while representing the union, he sent a letter to bring employees's complaints to the attention of the USMS, MVM's client, and asked for its intervention. Rodriguez's conduct constitutes activity protected by the NLRA and therefore it cannot be prohibited by MVM. *See Handicabs, Inc. v. N.L.R.B.*, 95 F.3d 681, 685 (8th Cir.1996) *cert. denied* 521 U.S. 1118, 117 S.Ct. 2508, 138 L.Ed.2d 1012 (1997) (providing that employees have the right to discuss work-related problems with their employer's clients). Accordingly, the Court holds that allowing MVM to recover damages under its tortious interference with a contract theory presents a "realistic threat of interference with the federal regulatory scheme." *Farmer*, 430 U.S. at 305, 97 S.Ct. 1056. To permit the state law claim for interference with a contract to proceed in this situation is to permit the risk of inconsistent results between this Court and the NLRB. If the Court were to determine that Rodriguez's communication with the USMS were improper, it would by necessity evaluate conduct governed by the NLRA, which is within the exclusive jurisdiction of the NLRB.

This case does not fall within any of the recognized exceptions to the *Garmon* doctrine. It is not a matter so "deeply rooted" in local concern as to require federal labor law to yield its jurisdiction. *See Farmer*, 430 U.S. at 297, 97 S.Ct. 1056; *Sears*, 436 U.S. at 188–89, 98 S.Ct. 1745; *Jones*, 460 U.S. at 676, 103 S.Ct. 1453. Neither is the controversy a matter of peripheral concern to the NLRA; rather, MVM's state law claim falls deep within the roots of federal labor law. Balancing

the concerns between the state tort law and the NLRA, the Court finds that the infringement on federal labor policy would be substantial because the state claim presented is inextricably intertwined with federal labor law.

Decisions from other federal courts in which state interference with contract claims were not preempted are easily distinguishable from the facts of this case. For example, in *Galveston Linehandlers, Inc. v. Int'l Longshoremen's Assoc.*, plaintiffs sued two individuals and a union for alleged interference with a contract as well as other state law causes of action. 140 F.Supp.2d 741 (S.D.Tex.2001). The union was accused of participating in sham negotiations as a cover for independent business competition. *Id.* at 747. It was also accused of convincing the plaintiffs' clients to cease doing business with them not to gain leverage in a labor dispute but to benefit a newly formed company allied to the union. *Id.* The *Galveston Linehandlers'* court deemed this behavior to be "'peripheral' at best" to the NLRA. *Id.* Unlike in *Galveston Linehandlers*, there is no inference that may be drawn from the record that Rodriguez's conduct was done with an ulterior motive unrelated to the labor dispute.[10]

Because Rodriguez's conduct is expressly covered by section 7 of the NLRA, the Court cannot permit the state claim to go forward. There is a clear risk of inconsistent adjudications by this Court and the NLRB. Consequently, federal law preempts the state claim for interference with a contract. *See Lumber Production*

10. *Beverly Hills Foodland, Inc. v. United Food and Commercial Workers Union, Local 655*, 39 F.3d 191 (8th Cir.1994), is another case in which a court did not hold a tortious interference with contract claim to be preempted by the NLRA. Citing *Linn*, and *Old Dominion*, the Eighth Circuit required that malice be proven as both an element of a defamation claim and a tortious interference with contract claim, where the latter is based upon the same conduct as the defamation claim. *Id.* at 196. The Eighth Circuit did not, however, discuss how the *Garmon* doctrine applied to the tortious interference with a contract claim. *Id.* at 196–97.

*Indus. Workers, Local No. 1054 v. West Coat Indus. Relations Ass'n, Inc.,* 775 F.2d 1042 (9th Cir.1985) (preempting a state law claim for tortious interference with a prospective contract where the conduct alleged was arguably prohibited as an unfair labor practice); *In re Sewell,* 690 F.2d 403 (4th Cir.1982) (preempting the state claim for tortious interference with contract because the state claims conduct was adjudicated to violate section 8(a)(5) by the NLRB); *Volentine v. Bechtel,* 27 F.Supp.2d 728, 736 (E.D.Tex.1998) (preempting the state law claims for interference with a contract and conspiracy to interfere with a contract tortiously because the state claims were inextricably intertwined with federal labor law and there was a substantial risk of interference).

▮▮▮ Even if the Court were to assume, *arguendo,* that Rodriguez's conduct was not protected by the NLRA, MVM's claim for interference with a contract would still fail because MVM has not shown that it suffered any damages. MVM asserts that Rodriguez attempted to interfere with its contract with the First Circuit by publishing a defamatory letter. When explaining the apparent damage that Rodriguez's letter caused to MVM and the purpose of this suit, an official of MVM said that the letter "went to the heart of who [MVM is] as a responsible government contractor." (Docket No. 48–6, Exh. E, p. 52) The federal contract was renewed in October, 2007, however, eight months after the USMS received Rodriguez's letter. Moreover, MVM's performance evaluations by the USMS were generally positive. The Supreme Court of Puerto Rico has consistently stated that it is essential that the existence of damages not be speculative or the product of a caprice or a whim for tort actions to proceed. *Goenaga v. West Indies Trading Corp.,* 88 D.P.R. 865, 911 (1963); *Prado Martorell v. Quiñones,* 78 D.P.R. 322, 335 (1955); *Maysonet v. Sucesion De Arcelay,* 70 D.P.R. 167, 175 (1949); *White Star Bus Line, Inc. v. Glens Falls Indemnity Co.,* 60 D.P.R. 852, 861 (1942). MVM has not alleged real damages in this claim; it simply speculates that the contract might be rescinded because it is under protest by other bidders. Even if real damages were proved, however, MVM still must demonstrate that the letter was the proximate cause of this result, and it has also failed to do that.

In sum, the Court holds that MVM's tortious interference with a contract claim is preempted by the NLRA. In the alternative, the Court also holds that MVM fails to state a claim for tortious interference with a contract because it has not supported its allegation that it suffered damages. Accordingly, the Court **DENIES** MVM's motion for summary judgment on its tortious interference claim and instead **DISMISSES** MVM's tortious interference with a contract claim.[11]

### C. Title VII

Title VII of the Civil Rights Act of 1964 prohibits discrimination against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race,

---

**11.** In count two of the complaint, MVM alleged a cause of action under article 1802 of the Puerto Rico Civil Code, the general tort provision in Puerto Rican law. Both defamation and tortious interference with contractual relations fit doctrinally within article 1802. Because MVM did not raise a separate argument concerning application of article 1802 in its briefs before the Court, and because both specific tort causes of action fit within the general one, the Court does not understand that MVM has alleged a separate cause of action against Rodriguez for a generic tort. Nonetheless, if MVM were to have alleged a separate generic tort against Rodriguez, it too would fail because MVM failed to support its allegation that it suffered real damages, as discussed above.

color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Title VII provides a cause of action for both discrimination and retaliation. *Petitti v. New England Telephone & Telegraph Co.,* 909 F.2d 28, 31 (1st Cir.1990). The "anti-retaliation" provision of Title VII prohibits an employer from taking an adverse employment action against an employee who initiated an action under Title VII. 42 U.S.C. § 2000e–3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.")

To establish a *prima facie* case of retaliation, a plaintiff must prove by a preponderance of the evidence that (1) he engaged in protected conduct under Title VII; (2) he suffered an adverse employment action; and (3) the adverse action was causally connected to the protected activity. *Dressler v. Daniel,* 315 F.3d 75, 78 (1st Cir.2003); *Hernandez–Torres v. Intercontinental Trading, Inc.,* 158 F.3d 43, 47 (1st Cir.1998). "An allegedly retaliatory act must rise to some level of substantiality before it can be actionable." *Noviello v. City of Boston,* 398 F.3d 76, 92 (1st Cir.2005) (*citing Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir.1998)). The scope of the anti-retaliation provision of Title VII, unlike the anti-discrimination provision, extends beyond workplace-related or employment-related acts and harm. *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 67, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

In this case, Rodriguez fails to allege a *prima facie* case of retaliation because he fails to allege that he engaged in protected conduct under Title VII. Instead, he alleges, in a conclusory manner, that MVM retaliated against him because he "made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing" under Title VII. (Docket No. 19, p. 3) Specifically, he alleges that MVM's retaliatory actions "arose directly from [the] employment relationship, or was related to employment." (Docket No. 19, p. 4) Nowhere in Rodriguez's Second Amended Counter Complaint [sic] does he allege that he belongs to a protected class (e.g., race, gender, religion, sex, etc.) under Title VII. Neither does he allege that he filed a complaint or otherwise assisted with an investigation involving a protected class under Title VII.

The core of Rodriguez's allegation is that he was terminated after MVM became aware that he signed a letter sent to the USMS, informing the USMS of certain labor and employment related disputes between the CSOs and MVM. Quite simply, the rights to work or bargain collectively, or enforce a contract, are not rights enshrined in Title VII. In other words, by alleging that he was involved in certain labor or employment disputes, Rodriguez does not allege that he belongs to a protected class under Title VII. Therefore, the Court **GRANTS** MVM's motion for judgment on the pleadings in regards to Rodriguez's Title VII claim.

### D. Puerto Rico Whistle-blower Act ("Law 115")

Law 115, or the Whistle-blower Act, protects employees that collaborate in investigations or offer testimony before an administrative, judicial or legislative forum, from adverse actions by their employers. P.R. Laws Ann. tit. 29 § 194a. An employee establishes a *prima facie* case under Law 115 by proving that (1) he engaged in one of the protected activities

set forth in the Whistle-blower Act and (2) he was subsequently discharged, threatened or suffered discrimination at work. *See* P.R. Laws Ann. tit. 29 § 194a(a); *Irizarry v. Johnson & Johnson*, 150 D.P.R. 155, 164 (2000).

MVM offers three defenses to Rodriguez's Whistle-blower Act claim. First, MVM argues that the USMS letter sent before Rodriguez's termination does not qualify as offering testimony pursuant the Act because the USMS is not an administrative, judicial or legislative forum. According to MVM, the Act only protects testimony presented to agencies as defined by Puerto Rican law, which MVM interprets to exclude the USMS. Second, MVM claims that only a current employee who offers testimony is protected under the Act. Hence, Rodriguez is not protected by the Act because the charges before the NLRB and the EEOC were filed after he was no longer an employee.

The purpose of the Whistle-blower Act is to protect employees that offer information to any governmental forum under any procedure. *Irizarry v. Johnson & Johnson*, 150 D.P.R. 155, 168 (2000). The language of the statute itself protects employees appearing before a government forum in Puerto Rico, rather than any forum *of* Puerto Rico. The statutory language does not exclude the federal fora.

 The USMS, a federal law enforcement agency within the Department of Justice, is charged with statutory duties that include providing security services to federal courthouses, courtrooms, and the judiciary. *See* 28 U.S.C. § 566(a). This agency is an appropriate forum to present complaints regarding safety matters because it is responsible for the security of the federal courthouse in Puerto Rico. *See* id. The labor dispute between the CSOs and MVM as well as the possible violation of the federal contract are of primary concern to the USMS because both issues could negatively affect the performance, safety and security in the District Court of Puerto Rico. Moreover, the USMS, is an agency, as defined by the federal law. Interpreting the local labor law in the most favorable way to the employee, the Court finds that the USMS qualifies as an agency pursuant to the Whistle-blower Act and the testimony presented to this agency is covered by it. *See Rosario Toledo v. Distribuidora Kikuet*, 151 D.P.R. 634 (2000); *Irizarry v. Johnson & Johnson Consumer Products Co.*, 150 D.P.R. 155, 164 (2000); *Mendez Orellana v. Fondo del Seguro del Estado*, 140 D.P.R. 375 (1996).

 The conduct of filing charges before the EEOC and the NLRB in this case, however, is not protected by the Whistle-blower Act. As MVM correctly asserts, Rodriguez was discharged on March 1, 2007 and it was not until June 22, 2007 that he filed the EEOC and NLRB complaints. The Whistle-blower Act covers current employees who offer or attempt to offer testimony, and former employees who were discharged because of an attempt to offer testimony. Neither situation is present in this case. MVM was no longer Rodriguez's employer by the time he filed the charges with the EEOC and the NLRB, and thus MVM could not have retaliated against Rodriguez for filing those complaints. Therefore, the Court concludes that Rodriguez's filing of the complaints with the EEOC and the NLRB is not conduct protected by the Whistle-blower Act.

A separate argument, which MVM scarcely raises in a footnote, is that the claim is preempted by the NLRA under the *Garmon* doctrine. Saved by a footnote, MVM finally hit the nail on the head. The Supreme Court has stated and restated its approach for determining the instances where state regulation is

preempted by the NLRA.[12] As discussed in the preceding section dedicated to the tortious interference with contract claim, in *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), the Supreme Court afforded considerable deference to the NLRA. The Court established that when deciding if a state claim is preempted, the determination to be made is whether the conduct that the State seeks to regulate is actually or arguably protected or prohibited by the NLRA.

The *Garmon* doctrine, as refined by *Sears*, established that when there is an "identical controversy" to that which could have been or was previously placed before the NLRB and is presented later before the State or federal court, the claim is preempted. *Sears Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978); *see also Volentine v. Bechtel, Inc.* 27 F.Supp.2d 728, 733 (E.D.Tex.1998) (*quoting Windfield v. Groen*, 890 F.2d 764, 767 (5th Cir.1989)).

In this case, Rodriguez filed a charge with the National Labor Relations Board to report that MVM violated Sections (8)(a)(1) and (8)(a)(3) of the Act by suspending, discharging, and refusing to reinstate him because he engaged in union and/or other protected activities. The question before the Court is whether this claim filed before the NLRB preempts Rodriguez's Whistle-blower Act counterclaim before this Court, in which he argues that he was fired for sending the USMS letter.

The Whistle-blower Act claim is preempted for several reasons. First, a claim was already initiated in the NLRB

and it deals with the same fundamental element of Rodriguez's wrongful discharge. *See Jones*, 460 U.S. at 682, 103 S.Ct. 1453. Pursuant to the *Garmon* doctrine, as refined by *Sears*, a cause of action for retaliation is preempted where the controversy that was presented in the NLRB is the same controversy as the one presented to this Court.

Second, according to section 7 of the NLRA, employees have the right to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection. *See* 29 U.S.C. § 157; *NLRB v. Portland Airport Limousine*, 163 F.3d 662, 664 (1st Cir.1998). The term "concerted activity" is not defined in the NLRA. *Portland Airport Limousine*, 163 F.3d at 665. Nonetheless, this term has been interpreted to include activity "engaged in with, or on the authority of, other employees, and not solely by and on behalf of the employee himself." *Id.* (internal quotations and citations omitted). Here, Rodriguez, President of Local 72, included in the letter allegations that MVM violated the collective bargaining agreement, the First Circuit contract and federal labor laws. Rodriguez requested that the USMS investigate these matters. This conduct is more than of "peripheral concern" to the NLRA; it constitutes concerted activity protected by the Act.

Third, Rodriguez's discharge for exercising his rights under the NLRA is conduct prohibited by section 8 of the Act. This section makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7]." 29 U.S.C. § 158; *see Portland Airport Limousine*, 163 F.3d at 664.

---

12. *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); *Iron Workers v. Perko*, 373 U.S. 701, 83 S.Ct. 1429, 10 L.Ed.2d 646 (1963); *Farmer v. Carpenters*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977); *Sears Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978).

Under these circumstances, permitting a Whistle-blower Act claim to go forward presents a substantial threat of interference with the federal regulatory scheme. In addition, there is a claim still pending before the NLRB and deciding this controversy entails an obvious risk of creating inconsistent judgments in distinct fora. The Court, hence, finds that Rodriguez's Whistle-blower Act claim is preempted by the NLRA pursuant to the *Garmon* doctrine. Therefore, the Court **GRANTS** MVM's motion for judgment on the pleadings as regards Rodriguez's Whistle-blower Act claim.

### E. Malicious Prosecution

 As a general rule, in Puerto Rico there is no *per se* civil damages action for the initiation of a civil suit unless specifically authorized by statute. *Gimenez Alvarez v. Silen Maldonado, et al.*, 131 D.P.R. 91, 96 (1992); *Banco Popular de Puerto Rico v. Luna Gonzalez*, 2006 WL 3337152 *4 (T.C.A.2006). The "judicial penalty for the improper use of legal proceedings is found in the imposition of costs and attorney's fees" in the same suit. *Gimenez Alvarez*, 131 D.P.R. at 97 (citing *Pereira v. Hernandez*, 83 D.P.R. 160, 164–65 (1961)). Nonetheless, an exception to this rule exists for the "malicious prosecution" of a suit where the facts of the case show extreme circumstances including harassment with unjustified actions instituted with malice. A plaintiff filing a claim for malicious prosecution must allege the following: (1) that a civil or criminal action was instituted by the defendant or at his or her request; (2) that the prosecution ended favorably to the plaintiff; (3) that it

was instituted maliciously and without probable cause; and (4) that the plaintiff suffered damages caused by the suit. *Gimenez Alvarez*, 131 D.P.R. at 97 (citing *Fonseca v. Oyola*, 77 D.P.R. 525, 528 (1954)).

*Fonseca v. Oyola*, the only Puerto Rico Supreme Court case recognizing a claim for malicious prosecution based upon the prior filing of a civil claim, was decided in 1954. In that case, the plaintiff used the civil judicial forum knowing that the complaint was spurious and acted with the sole purpose of harming the defendant. *Fonseca*, 77 D.P.R. at 528–29; *Banco Popular de Puerto Rico*, 2006 WL 3337152 at *3. Specifically, the defendant had filed three previous eviction suits against the plaintiff. *Fonseca*, 77 D.P.R. at 526–27. The defendant abandoned the first two claims only to file the third claim. *Id.* The claims in each case were all the same. *Id.* The circumstances of *Fonseca* were much more egregious than those alleged here, where MVM has only filed one claim against Rodriguez and has prosecuted that claim faithfully. Thus, not only is *Fonseca* not at all factually analogous to this case, but Rodriguez has failed to allege all of the elements of a claim for malicious prosecution.

 MVM argues correctly that Rodriguez has not met the second element of a claim for malicious prosecution: that the civil action preceding the cause of action for malicious prosecution ended favorably to the plaintiff. Of course, it would be impossible for Rodriguez to allege this element because he has filed the claim for malicious prosecution, which he styles a claim for the wrongful institution of a civil proceeding,[13] as a counter-claim in the

---

13. Notably, although Puerto Rican case law uses the term malicious prosecution interchangeably for claims based upon both criminal and civil actions, the Restatement Second of Torts draws a distinction between the two. Restatement (Second) of Torts §§ 653, 674.

According to the Restatement, the improper institution of criminal proceedings may lead to a claim for "malicious prosecution," and the improper use of civil proceedings may lead to a claim for "wrongful use of civil proceedings." *Id.* In either case, the preced-

very same case which forms the basis for his claim of malicious prosecution. Such a claim must fail because it puts the cart before the horse. *See, e.g., Airlines Reporting Corp. v. Belfon,* 351 F.Supp.2d 326, 328 (D.Vi.2004); *Kalso Systemet, Inc. v. Jacobs,* 474 F.Supp. 666, 670 (S.D.N.Y. 1979); *Babb v. Superior Court of Sonoma County,* 3 Cal.3d 841, 92 Cal.Rptr. 179, 479 P.2d 379 (1971); 8 Stuart M. Speiser et al., The American Law of Torts § 28.23 (1991); *but see State ex rel. General Motors Acceptance Corp. v. Standridge,* 181 S.W.3d 76 (Mo.2006). Accordingly, the Court **GRANTS** MVM's motion for judgment on the pleadings in regards to Rodriguez's claim for malicious prosecution.

For the reasons stated above, the Court **TAKES NOTE** of MVM's motion in compliance; **GRANTS** MVM's motion for judgment on the pleading; **GRANTS IN PART** and **DENIES IN PART** Rodriguez's motion to take note of the administrative law judge's decision in his NLRB proceeding; **GRANTS** MVM's motion to strike Rodriguez's Local Civil Rule 56 statement of facts; **DENIES** MVM's motion for summary judgment; and **DENIES** as **MOOT** MVM's motion to stay the proceedings.

Both of MVM's claims are **dismissed with prejudice.** Rodriguez's three remaining counter-claims are also **dismissed with prejudice.** Judgment shall enter accordingly.

**IT IS SO ORDERED.**

ing suit must have terminated in favor of the person against whom it was brought. *Id.*